

# IN THE DISTRICT COURT FOR TULSA COUNTY
## STATE OF OKLAHOMA

| | |
|---|---|
| (1)  ANJI BRADSHAW, as Special Administrator for the Estate of Nathan Bradshaw, deceased,<br><br>Plaintiff,<br><br>v.<br><br>(2)  ARMOR CORRECTIONAL HEALTH SERVICES INC.,<br><br>Defendant. | **DISTRICT COURT**<br>**FILED**<br><br>MAR 1 3 2017<br><br>DON NEWBERRY, Court Clerk<br>STATE OF OKLA. TULSA COUNTY<br><br>Case No.<br>**CJ-2017-00979**<br><br>**JEFFERSON D. SELLERS** |

## PETITION

Plaintiff, Anji Bradshaw, as Special Administrator for the Estate of Nathan Bradshaw, deceased, ("Estate") for the Estate's cause of action against the above named Defendant, would state as follows:[1]

### PARTIES, JURISDICTION, VENUE

1.    Anji Bradshaw is the Court appointed Special Administrator for the Estate of Nathan Bradshaw ("ESTATE") established in Tulsa County District Court, Case No. PB-2016-324.

---

[1] Exhibits 4-15 were designated "Confidential" by the Sheriff's Office under a protective order entered in PB-2016-324.

**Exhibit No. 1**

2.     Armor Correctional Health Services, Inc. ("ARMOR") is a Florida for-profit corporation. In exchange for an annual base compensation of $5,721,909.18 from Tulsa County taxpayers, ARMOR contracted with the Tulsa County Board of County Commissioners ("BOARD") to assume BOARD's state and federal law obligation to deliver mental and medical health care ("Healthcare Services") at the David L. Moss Criminal Justice Center ("DLMCJC"). [*See* Ex. 1, Health Services Agreement ("HSA"), *see also* Ex. 2, HSA Contract Extension].

3.     The HSA between ARMOR and BOARD required compliance with standards promulgated by the National Commission on Correctional Health Care ("NCCHC") and the American Correctional Association ("ACA").

4.     ARMOR is liable under state law for the actions of its agents and employees at the DLMCJC under a theory of *respondeat superior* consistent with the common law principles set forth by the Oklahoma Supreme Court in *Baker v. Saint Francis Hosp.*, 2005 OK 36, 126 P.3d 602.

5.     Within one year of the date of loss, ESTATE timely served ARMOR with a Title 57 Notice on November 9, 2016. More than ninety (90) has passed with no response from ARMOR. There are no additional administrative procedures for the ESTATE to exhaust.

2

Exhibit No. 1

6.    As a private corporation, ARMOR is not entitled to any exemption from liability set forth in the Oklahoma Governmental Tort Claims Act, 51 O.S. § 151 *et seq*. *See Sullins v. American Med. Resp. of Okla.*, 2001 OK 20, 23 P.3d 259.

7.    The events described below occurred in Tulsa County, Oklahoma, making jurisdiction and venue proper.

### STATEMENT OF FACTS

**The Public-Private Business Model**

8.    ARMOR has a business model that generates revenue through governmental contracts. Through these contracts, ARMOR assumes responsibility for the government's obligation to provide Healthcare Services to people who are not free to seek out healthcare for themselves.

9.    To obtain these contracts, ARMOR submits bids to government vendors like BOARD. If awarded the contract, ARMOR provides Healthcare Services in return for payment by the government vendor.

10.    For ARMOR to achieve positive revenue from its contract, ARMOR must provide Healthcare Services at a net profit.

11.    To achieve net profits, ARMOR implements policies, procedures, customs, or practices to reduce the cost of Healthcare Services in a manner that will maintain or increase its profit margin.

3

**Exhibit No. 1**

12.     There are no provisions in ARMOR's contract with BOARD creating or establishing any mandatory minimum expenditure for the provision of Healthcare Services.

13.     ARMOR's contract with BOARD incentivizes cost-cutting measures in the delivery of Healthcare Services at the DLMCJC to benefit ARMOR's shareholders.

### In-Custody Suicide

14.     According to the United States Department of Justice, suicide is the leading cause of death in jails, accounting for 34% of jail deaths in 2013. *See* U.S. Dept. of Justice, Office of Justice Programs, Bureau of Justice Statistics, Mortality in Local Jails and State Prisons, 2000-2013 – Statistical Tables, Aug. 2015.[2]

15.     Suicide has been the leading cause of death in local jails each year since 2000, the first year the Department of Justice began collecting data. From 2009 to 2013, the suicide rate in jail facilities increased by 23%.

16.     From 2000 to 2013, suicide has been a more prevalent cause of death in local jail facilities than heart disease, AIDS-related illness, cancer, liver disease, and respiratory disease.

---

[2] *See* https://www.bjs.gov/content/pub/pdf/mljsp0013st.pdf (last visited March 7, 2017)

Exhibit No. 1

17.    The vast majority of suicides occur in a jail cell, usually when the person is alone and unsupervised. Suicides often involve bed sheets.

18.    On March 13, 2016, records indicate that Nathan Bradshaw ("BRADSHAW") was discovered in his cell at the DLMCJC hanging with a bed sheet wrapped around his neck. He died from his injuries three days later.

19.    As described in greater detail below, BRADSHAW's death was preventable and was caused by or contributed to by acts or omissions that are fairly traceable to ARMOR, its agents, and employees.

## Admission and Receiving Screening

### MARCH 8, 2016

20.    Records show that BRADSHAW was arrested and booked into the DLMCJC at 7:05 p.m. [*See* Ex. 3, Booking Detail].

21.    In two minutes from 8:09 p.m. to 8:11 p.m., records show that BRADSHAW was given a 152-question Receiving Screening by a Licensed Practical Nurse ("LPN") employed by ARMOR. Many of questions were not fully answered. [*See* Ex. 4, Receiving Screening].

22.    A "receiving screening" is defined by the NCCHC as a process of structured inquiry and observation intended to prevent newly arrived inmates who pose a threat to their own or others' health, mental health, or safety from being

5

admitted to the general population, and to get them rapid medical or mental health care. *See* NCCHC Standard, MH-E-02 (Essential).

23. During the Receiving Screening, BRADSHAW alerted ARMOR's LPN of the following: (1) that he used heroin daily; (2) that he recently injected drugs; (3) that he had received mental health treatment for bipolar disorder, manic depressive disorder, and borderline personality disorder; (4) that he had been inpatient at 12 & 12, a mental health facility for substance abuse; (5) that he has problems with heroin; and (6) that he had previously been in the facility in 2015. [*See* Ex. 4, pp. 2, 4-6].

24. Records from BRADSHAW's prior detentions at the DLMCJC were available to ARMOR's employees during the Receiving Screening. Those records included a section titled, "Alerts."

25. Records show that BRADSHAW's Alert history included the following: (1) withdrawal history; (2) seizure precautions; and (3) chronic care – neurology. [*See* Ex. 5, Alerts].

26. Records show the LPN who conducted the Receiving Screening approved BRADSHAW for assignment in general population. [*See* Ex. 4, p. 7].

27. During admission, records also show that BRADSHAW completed a Classification Evaluation Questionnaire ("CEQ"). The CEQ also notes that BRADSHAW was previously detained at the DLMCJC, and that he suffered from

6

a mental, physical or developmental disability. [*See* Ex. 6, Classification Evaluation Questionnaire].

28.     At 10:46 p.m., records show that BRADSHAW was assigned to cell DLM-M-1-J14-B. This cell is located in a general population housing unit. [*See* Ex. 7, Inmate Classification].

## Inadequate Treatment Protocols and Indifference to Adherence

### MARCH 9, 2016

29.     At 6:16 a.m., records show that BRADSHAW was placed on an "Opiate Detox Prevention Protocol" on telephone orders from a Nurse Practitioner. [*See* Ex. 8].

30.     Records show an LPN also entered a Clonidine prescription for BRADSHAW at 6:17 a.m. on orders from Dr. Thomas Gable, Jr. [*See* Ex. 8, Medical History, *see also* Ex. 15, Medication Orders]. The Clonidine orders instructed ARMOR to administer the medication twice a day for four (4) days. [*See* Ex. 15].

31.     Records show that ARMOR was scheduled to administer the first dose of Clonidine to BRADSHAW at 12:26 p.m., but failed to do so because BRADSHAW was "in court." [*See* Ex. 11]. The Jail Shift Log shows BRADSHAW returning to the housing unit at 1:18 p.m. [*See* Ex. 12].

Exhibit No. 1

32.   There is no indication from the MAR that ARMOR provided BRADSHAW with Clonidine on March 9, 2016. [*See* Ex. 11].

33.   At 6:17 a.m., records show that ARMOR ordered a Drug and Alcohol Assessment with a follow-up each day for six (6) days. [*See* Ex. 8, p. 2, Medical History, March 2016]. The subsequent flowsheet used by ARMOR was labeled "CIWA", or Clinical Institute Withdrawal Assessment.

34.   A CIWA is used to assess withdrawal from alcohol, but BRADSHAW denied using alcohol during the receiving screening. ARMOR did not assess BRADSHAW using a Clinical Opiate Withdrawal Scale ("COWS"), which is used to evaluate opiate withdrawal.

35.   Although ordered at 6:17 a.m., ARMOR did not initiate the CIWA until approximately 38 hours later, on March 10, 2016 at 8:18 p.m. [*See* Ex. 8, p. 2].

36.   By the end of March 9, 2016, records show that ARMOR had failed to administer 2 of 2 doses of Clonidine.

<u>MARCH 10, 2016</u>

37.   Records show that BRADSHAW received his first dose of Clonidine at 8:53 a.m. [*See* Ex. 11].

38.   At 4:39 p.m., records show that BRADSHAW was evaluated by ARMOR for a painful left forearm that included swelling, and redness. [*See* Ex. 9,

8

Exhibit No. 1

Sick Call]. The record indicates that BRADSHAW told the physician that he missed a vein when attempting to use drugs on March 8, 2016.

39.     In response, ARMOR put BRADSHAW on a regime of opiate-based Codeine for administration three times a day for five (5) days [*See* Ex. 9].

40.     ARMOR ordered opiated-based narcotics for BRADSHAW despite records indicating that it had already initiated an Opiate Detox Prevention Protocol on the morning of March 9, 2016 that did not include opiate-based medication.

41.     Records show that ARMOR checked-out Codeine to administer to BRADSHAW on the following dates and times: (1) March 10, 2016 at 4:30 p.m.; (2) March 10, 2016 at 9:00 p.m.; (3) March 11, 2016 at 5:00 a.m.; (4) March 11, 2016 at 1:00 p.m.; (5) March 11, 2016 at 10:00 p.m.; (6) March 12, 2016 at 9:00 a.m.; (7) March 12, 2016 at 1:07 p.m.; and (8) March 12, 2016 at 9:00 p.m. [*See* Ex. 10, Controlled Substance Inventory]

42.     The Controlled Substance Inventory shows that ARMOR checked out one dose of opiate-based Codeine for administration to BRADSHAW before his CIWA at 8:18 p.m., but it does not appear on the MAR. The disposition of this dose of Codeine is not accounted for in the MAR or in the Controlled Substance Inventory.

43.     Records show that ARMOR administered the first CIWA 8:18 p.m. The CIWA noted that BRADSHAW presented with mild nausea and no vomiting,

9

mild anxiety, mild itching, pins and needles, burning or numbness, and moderately severe hallucinations. [*See* Ex. 8, pp. 2-4].

44.    The MAR shows that BRADSHAW was not medically fit to receive his second dose of Clonidine at 9:09 p.m., but the MAR does show administration of the first dose of Codeine at 11:34 p.m. [*See* Ex. 11].

45.    By the end of March 10, 2016, records show that ARMOR had not administered 3 of the 4 doses of Clonidine, and the records do not account for 2 of the 3 doses of Codeine.

## MARCH 11, 2016

46.    The MAR shows that BRADSHAW received his second dose of Codeine at 5:43 a.m. [*See* Ex. 11].

47.    At 6:48 a.m., records show that ARMOR repeated the CIWA. The CIWA noted moderate tremors, some agitation, and mild joint discomfort. [*See* Ex. 8, pp. 4-6].

48.    At 9:50 a.m., the MAR shows that BRADSHAW received his second dose of Clonidine. [*See* Ex. 11].

49.    Records show that ARMOR repeated the CIWA at 12:16 p.m. The CIWA noted mild nausea with no vomiting, mild hallucinations, and mild sensitivity to light. [*See* Ex. 8, pp. 6-8].

**Exhibit No. 1**

50.    Although the Controlled Substance Inventory noted that a dose of Codeine was checked out for administration to BRADSHAW at 1:00 p.m., the MAR does not identify any Codeine given near this time. The disposition of this dose of Codeine is not accounted for in the MAR or in the Controlled Substance Inventory.

51.    The MAR shows that BRADSHAW was not medically fit to receive his third dose of Clonidine at 9:20 p.m.

52.    The MAR shows that BRADSHAW did not receive his third dose of Codeine until 11:31 p.m. [*Id*]. This is the fifth dose of Codeine listed on the Controlled Substance Inventory.

53.    By the end of March 11, 2016, records show that ARMOR had not administered 4 of the 6 doses of Clonidine, and the records do not account for 3 of the 6 doses of Codeine.

## MARCH 12, 2016

54.    Although the Controlled Substance Inventory noted that a dose of Codeine was checked out for administration to BRADSHAW at 9:00 a.m., the MAR does not identify any Codeine given near this time. The disposition of this dose of Codeine is not accounted for in the MAR or in the Controlled Substance Inventory.

Exhibit No. 1

55.    There is no record in the MAR of BRADSHAW receiving any Clonidine at all on March 12, 2016. [*See* Ex. 11].

56.    There is no record of ARMOR conducting a CIWA on the morning or afternoon of March 12, 2016 as originally ordered.

57.    Records show that BRADSHAW refused lunch at 12:32 p.m. [*See* Ex. 12, Jail Shift Report].

58.    The MAR shows that BRADSHAW did not receive his fourth dose of Codeine until 1:25 p.m. [*See* Ex. 11, p. 3].  This is the seventh dose of Codeine listed on the Controlled Substance Inventory.

59.    Sometime before 4:01 p.m., records show that BRADSHAW submitted an Inmate Request Form that was received by Detention Officer Oyedele. It reads:

> I need to speak to someone in Mental Health. My anxiety is unbearable and has kept me from sleeping and caused me to pace around restlessly and hear things.

[*See* Ex. 13, Inmate Request Form; *see also* Ex. 12, Jail Shift Report].

60.    There is no documented response to the request.

61.    Records show that ARMOR repeated the CIWA at 6:42 p.m. The CIWA noted intermittent nausea but no anxiety. [*See* Ex. 8, pp. 8-10].

62.    Although the Controlled Substance Inventory notes an eighth dose of Codeine was checked out for administration to BRADSHAW at 9:00 p.m., the

Exhibit No. 1

MAR does not identify any Codeine given near this time. The disposition of this dose of Codeine is not accounted for in the MAR or in the Controlled Substance Inventory.

63.     By the end of March 12, 2016, records show that ARMOR had not administered 6 of the 8 doses of Clonidine, and the records do not account for 5 of the 9 doses of Codeine.

## **Conclusion of Detention**

64.     Records indicate that BRADSHAW left the housing unit for medical at 9:21 p.m., and returned at 10:05 p.m. Records indicate the housing unit was locked down at 10:31 p.m. [*See* Ex. 12].

65.     Records indicate the Detention Officer on duty failed to perform sight checks of BRADSHAW's cell in violation of Oklahoma Jail Standard 310:670-5-2(3). At approximately 12:11 a.m. on March 13, 2016, records indicate the new guard on duty found BRADSHAW unresponsive and hanging in his cell.

66.     The Detention Officer from the previous shift admitted that he made phantom entries into the computer system to give the appearance that sight checks were done, when he knew the opposite was true.

67.     Records indicate that BRADSHAW was transported to OSU Regional Medical Center at 00:32 hours on March 13, 2016. [*See* Ex. 14, Emergency Department Transfer Notification].

Exhibit No. 1

68.   The inconsistent use of Clonidine and Codeine, particularly the failure to adhere to the treatment regime relative to a person known to have an opioid addiction, substantially increased BRADSHAW's risk of suicide.

69.   BRADSHAW remained at OSU in the ICU until March 16, 2016. He is survived by his mother, father, siblings, and numerous friends and family members.

## STATEMENT OF CLAIMS

### Survival Act

70.   ESTATE adopts and incorporates by reference the preceding paragraphs as if fully set forth herein.

71.   Pursuant to 12 O.S. § 1051, the decedent's right of survival arising from the wrongful and intentional conduct by ARMOR is held by Anji Bradshaw, the legal representative of the Estate of Nathan Bradshaw. Plaintiff, Anji Bradshaw demands all damages recoverable under the Act, including damages for funeral and medical expenses and conscious pain and suffering, as well as any other damages recoverable under the Act.

### Wrongful Death

72.   ESTATE adopts and incorporates by reference the preceding paragraphs as if fully set forth herein.

14

73.   ESTATE's claims are actionable under the Oklahoma Wrongful Death Act, 12 O.S. § 1053. Such claims are distinguishable from Survival Actions in Oklahoma. *See Boler v. Security Health Care, L.L.C.*, 2014 OK 80, 336 P.3d 468.

74.   As a direct result of the wrongful and intentional acts of the Defendant, the next of kin of the decedent is entitled to incurred burial expenses, loss of the pecuniary value of services expected to be performed by the decedent and other damages recoverable under the wrongful death statute including, but not limited to solatium damages.

### Negligence

75.   ESTATE adopts and incorporates by reference the preceding paragraphs as if fully set forth herein.

76.   ARMOR owed a duty of reasonable care in the management of BRADSHAW's medical condition consistent with its contract.

77.   ARMOR breached that duty through the conduct detailed above, which includes, but is not limited to, the failure to conduct a complete receiving screening, the failure to base the classification recommendation upon a complete receiving screening, the failure to conduct a COWS, the use of a CIWA to assess an opiate addict, the failure to adhere to prescribed medications used as part of an

15

opiate withdrawal protocol, and the inconsistent use of opiate-based Codeine while implementing a non-opiod withdrawal protocol.

78.     The ESTATE has suffered damages as a direct and proximate result of these acts or omissions, for which ARMOR is liable.

### REQUEST FOR RELIEF

79.     The ESTATE respectfully requests the Court enter judgment upon the claims detailed above, and award damages at a subsequent hearing in an amount that exceeds $75,000.00.

Respectfully submitted,

BRYAN & TERRILL

By: _____
J. Spencer Bryan, OBA # 19419
BRYAN & TERRILL LAW, PLLC
9 East 4th St., Suite 307
Tulsa, OK 74103
Tele:  (918) 935-2777
Fax:   (918) 935-2778
Email:  jsbryan@bryanterrill.com
*Attorneys for the Estate of Nathan Bradshaw*

**ATTORNEY LIEN CLAIMED**
**JURY TRIAL DEMANDED**

16

**Exhibit No. 1**

## Health Services Agreement

APPROVED

OCT 0 7 2013

THIS AGREEMENT by and between the Board of County Commissioners of Tulsa County, Oklahoma ("BOCC"), on behalf of the Tulsa County Sheriff's Office ("TCSO"), and ARMOR CORRECTIONAL HEALTH SERVICES, INC. ("ARMOR") is entered into as of the 1st day of November, 2013.

Whereas, TCSO is charged with the responsibility for administering, managing and supervising the health care delivery system of the David L. Moss Criminal Justice Center ("Facility") located at 300 North Denver Avenue, Tulsa, Oklahoma, and the objective of the TCSO is to provide for the delivery of quality health care to those pretrial detainees, individuals sentenced to time in the county jail, ICE detainees, juveniles, and federal detainees, medically cleared for and physically accepted into the Facility, (Inmates) in accordance with the laws of the State of Oklahoma, American Correctional Association (ACA) standards, National Commission on Correctional Healthcare (NCCHC) standards, Prison Rape Elimination Act (PREA), Commission for Accreditation of Law Enforcement Agencies (CALEA); and in a manner set forth in the Requests for Proposal, the Response from ARMOR, department policies, procedures and derivatives and performance measures. ARMOR is in the business of providing correctional health care services and desires to provide such services for TCSO under the terms and conditions hereof; therefore, with the intent to be legally bound, and in consideration of the covenants and promises hereinafter made, the parties hereto agree as follows:

I:    **HEALTH CARE SERVICES**

1.1 **GENERAL.** BOCC hereby engages ARMOR to provide for the delivery of reasonable and necessary medical, dental, pharmaceutical, psychiatric and mental health services for the Facility. ARMOR hereby accepts such engagement according to the terms and provisions hereof.

1.2   **SCOPE OF SERVICES.** ARMOR will provide, professional medical, dental, psychiatric, pharmaceutical, and related health care and administrative services for the Inmates. This program will include a preliminary health evaluation screening of Inmates upon arrival at the Facility, regularly scheduled sick call, nursing coverage, regular physician visits, on-site infirmary care, physical evaluations, hospitalization, medical specialty services, emergency medical care, medical records management, pharmacy services, health education and training, a quality assurance program, administrative support services, and other services, as more specifically described hereinafter. If ARMOR finds that they cannot meet the terms of this contract or any part thereof, they shall promptly notify TCSO in writing of the area of non-compliance, so that the problem can be addressed.

1.2 COMPREHENSIVE MEDICAL/MENTAL HEALTH CARE. All detainees will be seen by the registered nurse (RN) or licensed practical nurse (LPN) in intake within two (2) hours of their arrival or immediately, if asked. Staffing of the intake area will include one LPN or RN with a second LPN or RN during peak hours of operation. Workstations for each intake nurse must be complete with a computer (provided by TCSO) and all clinical tools necessary to perform this work. If, at any time, intake is backed up more than 4 hours, additional staff sufficient to clear the back up will be required. ARMOR shall identify to TCSO those inmates with medical/mental conditions which may be worsened as a result of being incarcerated at the Facility or which may require extensive care while incarcerated.

229365

1 of 16

Exhibit 1

Exhibit No. 1

After review of the circumstances surrounding the charges, and when security risks are minimal, the TCSO shall make every effort to have those inmates released.

1.3 CLINIC OPERATIONS:  ARMOR shall operate the clinic/infirmary seven (7) days per week, including Sundays and holidays for necessary treatments, history and physicals (H & P's), prioritized sick call, and urgent care.  The physician or mid-level provider (MLP) will be physically on site eight (8) hours each week day and four (4) hours each  weekend day,  The same hours also apply to holidays.  They are to perform and enter into the electronic medical record (EMR) an H&P within 24 hours for every patient admitted into the infirmary and to round on every patient at a minimum of once each 24 hours while housed in the infirmary. They are to be available by telephone or telemedicine (if available) twenty four (24) hours per day, seven (7) days per week for consultation by the nurse for questions pertaining to the infirmary, suicide watch, sick call, intake, H&P's or segregation units. They must, at a minimum, be certified in basic life support (BLS).  It is permitted to have a resident physician in training as an adjunct to this call schedule acting under the supervision of the physician.  As medically appropriate, a subjective/objective/assessment/plan/education (SOAPE) note will be entered in the EMR.
LPN's may be staffed in the infirmary.

1.4 SPECIALTY SERVICES.  ARMOR will provide for specialty services on-site to the extent reasonably possible with the possible adjunct of telemedicine. To the extent specialty care is required and cannot be rendered on-site, ARMOR will make appropriate off-site arrangements for the rendering of such care.  ARMOR will make every effort to schedule routine off-site services in a manner convenient for TCSO transportation, and during the normal business hours of Monday through Friday, 8 a.m. to 4 p.m, or as reasonably agreed upon between ARMOR and the specialist's office. Costs for specialty services shall go toward the aggregate cap in section 1.9.

1.5 OPTOMETRY or OPHTHALMOLOGIC SERVICES.  ARMOR will not be required to provide basic optometry services for the purpose of providing new eyeglasses to Inmates.  ARMOR will provide ophthalmological services to the extent necessary to relieve or alleviate any exacerbation of a debilitating medical condition requiring ophthalmological services, or in the event of a court order to provide such services. Costs for optometry or ophthalmologic services shall go toward the aggregate cap in section 1.9.

1.6 PREGNANT INMATES.  ARMOR will provide health services to any pregnant Inmate in accordance with NCCHC standards, but health care services provided to an infant following birth will not be the responsibility of ARMOR.

1.7 EMERGENCY SERVICES.  ARMOR will provide first response emergency medical treatment to Inmates, visitors, and TCSO staff as necessary and appropriate on-site. ARMOR will provide off-site emergency medical care for Inmates, as required, through arrangements to be determined with local hospitals. ARMOR will be responsible for providing and maintaining adequate and functional emergency equipment and for the training and certification (BLS) of appropriate Armor staff to use that equipment. The numbers and location of AED's must be agreed upon by TCSO.  Provision of emergency services to staff shall be limited to injuries or short-term emergency care received while on duty at the jail.  ARMOR will arrange ambulance services for Inmates for emergency circumstances.  Routine transfers will be the responsibility of

Exhibit 1

Exhibit No. 1

TCSO in regards to off-site non-emergency medical treatment. Costs for emergency services shall go toward the aggregate cap in section 1.9.

1.8    HOSPITALIZATION SERVICES.   ARMOR will arrange for the admission of any Inmate who, in the opinion of Armor's medical director, requires hospitalization and will bear the costs thereof, limited in the following circumstances and amounts.

   (A) ARMOR will be responsible for all costs incurred for health care delivered off-site (outside the facility) for Inmates in accordance with the limits stated herein.
   (B) ARMOR and TCSO shall work together to establish an effective Discharge Planning program for Inmates.
   (C) ARMOR agrees to provide and monitor utilization and management services.

1.9    AGGREGATE LIMIT.   Any off-site, onsite specialty (by non-armor employees), telemedicine medical, emergency transport and off-site hospital guard (see section 7.3) services provided to any Inmate shall be limited in financial responsibility to ARMOR in the following manner:

ARMOR has an annual expenditure of $500,000.00 for the aggregate cost of all off-site, on-site specialty care by non-Armor employees, emergency transport, telemedicine health care and off-site hospital guard duty services. If, in any fiscal year, the off-site, on-site specialty care by non-Armor employees, telemedicine expenses, emergency transport and off-site hospital guard duty services stay below $500,000.00, ARMOR will rebate back to TCSO one hundred percent (100%) of the savings.

ARMOR will provide detailed, individual inmate, itemized billing of all off-site and on-site expenditures to TCSO on a monthly basis.

1.10    REVIEW OF HOSPITAL AND OFF-SITE SERVICES.   Armor will be responsible for gathering all available information pertaining to other payor sources for health care starting at intake of each Inmate. Armor will provide that information to all hospital and off-site providers prior to or during medical treatment or at the earliest time it is available to facilitate the direct billing by the hospital or off-site provider to the Inmate's payor source. In addition, Armor will review all other invoices for hospital care and other off-site providers, updating outside payor source information and in routing the invoice to the appropriate agency for payment. If monies are received by Armor for hospitalizations or off-site medical care from outside payor sources, that money will be credited against the TCSO aggregate cap .

1.11    ASSUMPTION OF FISCAL RESPONSIBILITY FOR INMATE MEDICAL CARE.

(A) ARMOR will begin fiscal responsibility once an individual has been medically cleared for acceptance into the Facility and becomes an Inmate. The arresting agency assumes responsibility of an arrestee's health care at the time that arrestee is taken into custody and prior to becoming an Inmate.

(B) If services are requested by TCSO outside this contract (e.g. TSCO staff flu shots or Hepatitis C vaccinations), ARMOR shall make reasonable effort to provide such services. Such services will be at additional cost and will be invoiced to TCSO on a

Exhibit 1

Exhibit No. 1

monthly basis.  TCSO agrees to reimburse such costs within thirty (30) days of the receipt of said invoice.

1.12   ELECTIVE MEDICAL CARE.  ARMOR will not be responsible for the provision of elective medical care to Inmates.  For purposes of this agreement, elective medical care means medical care which if not provided, would not in the opinion of ARMOR's Medical Director, cause the Inmate's health to deteriorate or cause definite harm to the Inmate's well-being.

1.13   TRANSPORTATION SERVICES.  To the extent any Inmate, visitor or TCSO staff requires off-site health care treatment (e.g., hospitalization, specialty services, etc.), TCSO will notify appropriate routine transportation services.  ARMOR will be responsible for ambulance services for Inmates requiring emergency transportation. Emergency transportation of inmates will be counted toward the aggregate cap as outlined in Section 1.9 above.

1.14   SUPPLIES AND PHARMACUETICALS.  ARMOR will be responsible for all office and medical supplies used in meeting the specifications of this contract. Medical supplies are to include prescriptions and over-the-counter medications. The first $25,000 per contract year  in costs for blood products and associated supplies shall be applied against the aggregate cap in section 1.9  (pro rated for lesser periods).  Any costs for blood products and associated supplies in excess of $25,000 per contract year shall be reimbursed to ARMOR by TCSO/BOCC.

1.15   POST-EXPOSURE PROTOCOL & EMERGENT SITUATIONS: Armor will provide prophylactic care to TCSO employees and Armor employees in the event of possible exposure to blood borne pathogens as required by NCCHC. For the purpose of this section, communicable disease shall be defined as blood borne diseases such as Human Immunodeficiency Virus (HIV) or Hepatitis. Should possible exposure occur, the exposed individual shall present to Armor staff to be evaluated, and, as medically indicated and authorized by the individual being evaluated, provided prophylactic emergent care. Armor shall instruct the individual on any additional follow-up that may be necessary. The individual's health care provider shall provide all follow-up care.

1.16   OKLAHOMA DEPARTMENT OF CORRECTIONS DETAINEES. ARMOR will provide medical services to all Oklahoma Department of Corrections, ICE and Marshall's service detainees while such individuals are detained at the Facility.  All billable (off-site medical services and itemized on-site care, supplies or pharmaceuticals) charges will be submitted for payment to the appropriate responsible party. Should such billing and reimbursement only be accepted through Tulsa County, all reimbursements will ultimately be paid back to ARMOR.

1.17 KIOSK REQUEST SYSTEM: Inmates at the Facility have access to an electronic system for general and specific questions/comments/complaints. ARMOR agrees that such requests categorized as a medical/healthcare specific question will be triaged within four (4) hours of receipt by ARMOR.

Exhibit 1

Exhibit No. 1

1.18 Inmates housed in the infirmary will be evaluated every shift by the infirmary nurse. Inmates housed in the segregated unit or in observation cells for suicide watch will be evaluated as medically indicated. An appropriate note in the EMR will be generated.

1.19 TELEMEDICINE: A plan for implementation of telemedicine to offset transporting inmates for outside specialty services, if specialists cannot come on-site for whatever reason, shall be submitted to the Facility within 120 days of execution of this Agreement (at or on March 1, 2014).

1.20 SPECIAL NEEDS DIETS: ARMOR will provide dietary consultation when such services are clinically indicated or needed as a part of a therapeutic regimen or treatment plan.

1.21 PHARMACEUTICAL SERVICES: ARMOR will utilize a local retail pharmacy when necessary prescriptions cannot be readily obtained from other sources. When manufacturer problems or national shortages preclude the continuation of necessary medications, therapeutic substitutions will be made so that care is not interrupted. In the event of a national shortage of vaccines, ARMOR will follow recommendations of the Centers for Disease Control (CDC) and will track inmates/detainees who require vaccination and ensure its provision when supplies become available.

II:   PERSONNEL

2.1   STAFFING. ARMOR will provide the staffing set forth in Exhibit A.

A. ARMOR agrees to notify the facility director or designee when key health services personnel, such as the Health Services Administrator and/or the Medical Director, will be off the grounds of the facility for any leave of absence exceeding 24 hours. A written notification must include the name, title, and contact information of the person providing coverage.

B. The TCSO will have the right to approve key ARMOR personnel, and such approval shall not be unreasonably withheld or delayed, to include the following: health services administrator, director of nursing, facility medical director, psychiatrist and mid-level practitioner.

C. Should the inmate population exceed 1900, TCSO and Armor agree to review staffing and the base contract price to ensure proper care is reasonably able to be provided. If additional staffing is needed to properly care for the Inmates, TCSO and Armor shall agree upon base additional compensation required to provide the needed staffing.

D. After the first 90 days from Armor's commencement of services under this Agreement, a withhold from base compensation may be imposed by the TCSO for any unpaid hours on a monthly basis below total hours shown on Exhibit A. In such event, TCSO may deduct from its monthly payment to Armor at 100% of the average withhold rate for the position/category as set forth in Exhibit A which is attached and incorporated herein. In all cases, employees may be used to cover like positions when their credentials equal or exceed the credentials required for such position (e.g., an RN

Exhibit 1

Exhibit No. 1

may cover for an LPN).  Armor will provide TCSO with a monthly contract staffing compliance report showing all contract positions relative to the staffing matrix.

2.2    BACKGROUND CHECKS.  TCSO shall provide background criminal records checks on all ARMOR employees upon hire and as otherwise required by law or as requested by ARMOR.

2.3    SATISFACTION WITH HEALTH CARE PERSONNEL.  If the TCSO should become dissatisfied with any ARMOR personnel provided by ARMOR hereunder, ARMOR, in recognition of the sensitive nature of correctional services, will, following receipt of written notice from TCSO of dissatisfaction and the reasons therefore, exercise their best efforts to resolve the problem.  If the problem is not/cannot be resolved, ARMOR will remove the individual within a reasonable time frame considering effects on delivery of health care and recruitment/hiring of an acceptable replacement.  ARMOR shall immediately notify the TCSO of any disciplinary action instituted or pending against the license of any practitioner/staff employed by the ARMOR.

2.4    USE OF INMATES IN THE PROVISION OF HEALTH CARE SERVICES.  Inmates will not be employed or otherwise engaged by either ARMOR or TCSO in the direct rendering of any health care services.  Inmates may be used in positions not involving the rendering of health care services directly to Inmates as ARMOR and TCSO may mutually agree.

2.5    SUBCONTRACTING AND DELEGATION.  In order to discharge its obligations hereunder, ARMOR will engage certain health care professionals as independent contractors rather than as employees.  As the relationship between ARMOR and these health care professionals will be that of independent contractor, ARMOR will not be considered or deemed to be engaged in the practice of medicine or other professions practiced by these professionals, and the independent contractor relationship of ARMOR will not affect the exercise of the independent contractor's independent judgment in the practice of the profession.

2.6    DISCRIMINATION.  ARMOR will recruit, select, train, promote, transfer, and release its personnel, as contemplated hereunder, without regard to race, color, religion, national origin, handicap, veteran status, age, or gender (except where age, gender or handicap is a bonafide occupational qualification).  Further, ARMOR will administer its other personnel policies such as compensation, benefits, layoffs, return from layoff, company sponsored training, education, and tuition assistance without regard to race, color, religion, national origin, handicap, veteran status, age or sex.

2.7    Commencing with the contract start date, and monthly thereafter, ARMOR shall submit staffing plans for the Facility to the TCSO.  Any deviations from the established staffing plans must be communicated in writing to TCSO, including the reasons for the staffing shortage and the steps taken to alleviate the shortage.

Exhibit 1

Exhibit No. 1

III: <u>CONTINUOUS QUALITY IMPROVEMENT PROGRAM (CQI)</u>

3.1 <u>DEFINITION</u>: ARMOR shall institute a program of Continuous Quality Improvement (CQI) Program and Professional Peer Review, which will include, but not be limited to, audits, and medical record review. Physician peer reviews shall occur not less than annually. Within ninety (90) days of commencement of services under this agreement, ARMOR must provide evidence to the TCSO that a CQI Program is in place that includes quarterly meetings of the CQI committee and monthly Medical Audit Committee (MAC) meetings. The CQI program will use a multi-disciplinary committee and must involve all health care disciplines during the calendar year. Morbidity and Mortality reviews must come under the scope of CQI program.

3.2 ARMOR shall provide a peer review of all primary care providers to include physicians, psychiatrists, dentist, nurse practitioners, physician assistants, and Ph.D level psychologist, conducted on no less an annual basis. Peer reviews should include such activities as chart review, medical treatment plan review for special needs inmates, review of off-site consultations, specialty referrals, emergencies, and in-patient and outpatient hospitalization. The completion of the reviews should be appropriately documented. Where possible or appropriate to affect the purposes of peer review, such proceeding will be conducted in accordance with applicable peer review statutes or regulations and applicable confidentiality requirements.

IV. <u>ACCREDITATION</u>

4.1 <u>General</u>. ARMOR's services hereunder will be designed to be in compliance with the standards developed by the NCCHC for Jails based on the most current edition. However, ARMOR shall not be responsible for failure due to standards that are not directly related to medical care.

4.2 ARMOR's services hereunder will be designed to be in compliance with the standards developed by the ACA Standards for Adult Correctional Institutions in accordance with the most recent edition. However, ARMOR shall not be responsible for failure due to standards that are not directly related to medical care.

4.3 ACCREDITATION COST. ARMOR will schedule and pay for the NCCHC accreditation and its cost, including a mock survey if requested by the TCSO. ACA accreditation costs shall be paid by the TCSO.

V: <u>EDUCATION AND TRAINING</u>

5.1 <u>INMATE AND STAFF HEALTH EDUCATION</u>. ARMOR will conduct an ongoing health education program for Inmates and correctional officers at the Facility. This health care education program will include, at TCSO's request, programs in first aid, signs and symptoms of chemical dependency and withdrawal, recognition of the suicidal signs, and reactions to medical emergencies.

5.2 Both Armor and TCSO shall conduct their activities in full compliance with HIPPA, as amended

Exhibit 1

Exhibit No. 1

## VI:   REPORTS AND RECORDS/ELECTRONIC MEDICAL RECORDS

6.1   MEDICAL RECORDS.   ARMOR will maintain a medical record for each Inmate who has received health care services.   This medical record will be maintained pursuant to applicable law and will be kept separate from the Inmate's confinement record.   A complete copy of the applicable medical record will be available to accompany an Inmate's confinement record at the request of the TCSO.   A summary of significant medical problems will be provided to accompany an Inmate who is transferred to another correctional setting.   A complete copy of the applicable medical record will be available to accompany an Inmate who is transferred from the TCSO to another location for off-site medical services.   Medical records will be kept confidential, and ARMOR will follow the TCSO's policy with regard to access by Inmates and TCSO staff to medical records, subject to applicable law regarding confidentiality of such records.   No information contained in the medical records will be released by CHMO except as provided by TCSO policy, by a court order, or otherwise in accordance with applicable law.   TCSO owns and retains custody and control of all medical records.   Upon termination of this agreement, all medical records will be the property of TCSO.   All custody and control of medical records will meet HIPAA regulations.

(A) Assuming there are no delays with building an interface between the jail management system and the EMR or with cabling and hardware, initial implementation of an EMR, will be completed within thirty (30) days of the initiation of the contract unless otherwise agreed upon by TCSO and ARMOR. The parties realize adjustments to the EMR may need to occur after initial go live implementation.

6.2   REGULAR REPORTS BY ARMOR TO TCSO.   ARMOR will provide monthly reports to TCSO containing an analysis of health care services rendered hereunder and any other reports requested by TCSO, pertaining to the direct delivery of health care services, during the term of this contract.

6.3   INMATE HEALTH INSURANCE.   ARMOR must seek and obtain from any Inmate, information concerning any health insurance the Inmate might have that would cover services rendered by ARMOR hereunder, and TCSO will cooperate fully with ARMOR in its efforts to secure the same.

6.4   ARMOR RECORDS AVAILABLE TO TCSO.   ARMOR will make available to TCSO, at the request of the TCSO, all records, documents, and other papers relating to the direct delivery of health care services to Inmates.

6.5   TCSO'S RECORDS AVAILABLE TO ARMOR WITH LIMITATIONS ON DISCLOSURE.   During the term of this agreement and for a reasonable time thereafter, TCSO will provide ARMOR, at ARMOR's request, TCSO records relating to the provision of health care services to Inmates during the term of this agreement as may be requested by ARMOR or as are pertinent to the investigation or defense of any claim related to ARMOR's conduct.   TCSO will make available to ARMOR such records as are maintained by TCSO, hospitals, and other outside health care providers involved in the care or treatment of Inmates (to the extent TCSO has any control or possession of

Exhibit 1

Exhibit No. 1

those records) as ARMOR may reasonably request consistent with applicable law; provided, however, that any such information released by TCSO to ARMOR that TCSO considers confidential, will not, except as may be required by law, be distributed to any third party without prior written approval by TCSO.

## VII:  SECURITY

7.1   GENERAL.   ARMOR and TCSO understand that adequate security services are necessary for the safety of the agents, employees, and subcontractors of ARMOR, as wells as for the security of Inmates and TCSO staff.  TCSO will determine the necessity of security services sufficient to enable ARMOR and its personnel to safely provide the health care services called for hereunder and will provide the same.  ARMOR shall not be liable for failure to provide services due to security personnel being unavailable to ARMOR staff.  In the event ARMOR personnel are unable to gain access to an Inmate, ARMOR personnel shall immediately contact a TCSO detention supervisor for assistance so that care may be timely provided.

7.2   TRANSPORTATION OFF-SITE.  TCSO will provide security as necessary and appropriate in connection with the transportation of any Inmate between the TCSO and any other location for off-site services as contemplated herein.

7.3   OFF-SITE HOSPITAL GUARD DUTY. ARMOR agrees to hire from a pool of TCSO personnel, previously approved by TCSO, to provide security in the hospital for those Inmates requiring off-site hospitalization. This relationship will be that of independent contractor. To the extent the officer must at any time take law enforcement action s/he automatically assumes on-duty status for all applicable purposes, including liability. If the pool of TCSO personnel is exhausted, TCSO shall arrange for security of hospitalized Inmates. All costs associated with ARMOR providing off-site hospital guard duty will be calculated into the aggregate cap in section 1.9, above.

## VIII:  OFFICE SPACE AND EQUIPMENT

8.1   OFFICE SPACE AND SUPPORT.  TCSO agrees to provide ARMOR with office space, facilities, office furniture and fixtures, utilities sufficient to enable ARMOR to perform its obligations hereunder.  ARMOR will be responsible for all long distance charges.

8.2   DELIVERY OF POSSESSION.  TCSO will deliver to ARMOR, on the date of commencement of this agreement, possession and control of all office furniture and fixtures currently in place at the TCSO health care facilities, which will remain the property of the TCSO and BOCC.

8.3   SUPPLIES.  ARMOR warrants and represents that the quality and quantity of supplies provided by ARMOR during this agreement will be sufficient to enable ARMOR to perform its obligations hereunder.

8.4   GENERAL MAINTENANCE SERVICES.   TCSO will provide for each Inmate receiving health care services no less than the full range of services and facilities provided by TCSO for other Inmates at the Facility.

Exhibit 1

Exhibit No. 1

8.5    EQUIPMENT. ARMOR and TCSO will conduct a joint inventory of all equipment within thirty (30) days of the contract start date. After written agreement between TCSO and ARMOR that existing equipment is adequate and in good working condition, ARMOR will be responsible for the purchase of all replacement equipment excluding equipment items that exceed $500 in cost. Equipment purchased by ARMOR will belong to ARMOR upon completion of contract. ARMOR will be responsible for all preventative and predictive maintenance on County equipment, but will not be responsible for replacement of County equipment.

IX:    TERM AND TERMINATION OF AGREEMENT

9.1    CONTRACT TERM. This agreement shall be effective on November 1, 2013 at 12:01 a.m. CST and end on June 30, 2014. This agreement may be renewed by mutual agreement in one (1) fiscal year increments, to be memorialized by addendum to this contract. If the parties hereto have not reached agreement on a new fiscal year agreement by June 1st of each succeeding year, then this agreement will terminate upon the expiration of the then-existing term. The base period for comparison for cost redetermination shall be an annual average from April to April and shall be based upon the Consumer Price Index which incorporates the Tulsa area. Such renewal adjustments shall be calculated using a percentage in which the numerator is the Index for the third month preceding the beginning of the new 12-month period and the denominator is the Index for the third month preceding the beginning of the prior 12-month period.

9.2    TERMINATION. This agreement may be terminated in the event of any one of the following:

     (A)    TERMINATION FOR DEFAULT. In the event either party shall give written notice to the other that such other party has materially defaulted in the performance of any of its obligations and such default shall not be cured within the thirty (30) days following the giving of such written notice, the party giving the written notice shall have the right immediately to terminate this Agreement.

     (B)    TERMINATION BY AGREEMENT. In the event the BOCC and ARMOR mutually agree in writing, with a thirty (30) day notice, the Agreement will be terminated.

     (C)    Either party may terminate this Agreement without cause by providing the other party no less than 120 days advance written notice of termination.

9.3    RESPONSIBILITY FOR INMATE HEALTH CARE. Upon termination of this agreement, total responsibility for providing health care services to all Inmates, including Inmates receiving health care services off-site will be transferred from ARMOR to the TCSO and BOCC.

X:    COMPENSATION

10.1    COMPENSATION. BOCC will pay ARMOR the sum of $3,659,316.00 for the 8-month term of this contract. ARMOR will bill TCSO the sum of $457,414.47 per month upon proper invoice for the completed month. Unless promptly disputed, TCSO

Exhibit 1

Exhibit No. 1

shall pay each invoice within 30 days of receipt. Failure to do so will result in interest accruing at the rate of 1% per month until paid in full.

10.2   **PER INMATE PER DAY ESCALATOR/DE-ESCALATOR.** The daily inmate count shall be taken at 8:00 a.m. each day. At the end of each month, an average daily inmate count shall be calculated and provided to ARMOR. ARMOR will bill TCSO $1.88 per inmate per day for each day the count exceeds 1,900 inmates. If the average daily inmate count for any given month is less than 1,500, ARMOR will refund $1.88 per inmate per day below 1,500 back to BOCC.

## XI:   LIABILITY AND RISK MANAGEMENT

11.1   **INSURANCE.** At all times during the term of this agreement, ARMOR will maintain general liability and professional liability insurance covering ARMOR, its employees, its officers, and agents with limits not less than one million dollars ($1,000,000) per occurrence and five million dollars ($5,000,000) in the aggregate annually. Such coverage amounts will also extend to physicians, dentists, and psychiatrists engaged by ARMOR on an independent contractor basis for the provision of health services hereunder. ARMOR shall provide BOCC with a certificate confirming the existence of such coverage and providing for notice of BOCC of any cancellation of such coverage.

11.2   **INDEMNITY.** To the fullest extent permitted by law, ARMOR shall indemnify and hold harmless the Tulsa County Criminal Justice Authority, BOCC, Tulsa County, the Tulsa County Sheriff's Office and its elected officials, agents, servants and/or employees from all claims, actions, lawsuits, damages, judgments or liabilities arising out of the health care delivery system provided by ARMOR at the Facility, excluding any claims, in whole or in part relating to the acts and omissions of TCSO or other non-ARMOR staff or subcontractors. ARMOR and TCSO agree that should settlement negotiations occur as a result of any civil action arising out of the healthcare delivery system at the Facility, both parties will discuss settlement options with each other prior to release. Should ARMOR be named a defendant in an action arising out of medical care at the Facility, ARMOR shall notify the TCSO in a timely manner.

## XII:   MISCELLANEOUS

12.1   **INDEPENDENT CONTRACTOR STATUS.** TCSO expressly acknowledges that ARMOR is an independent contractor and nothing in this agreement is intended nor shall be construed to create an agency relationship, an employer/employee relationship, a joint venture relationship, or any other relationship allowing TCSO to exercise control or direction over the manner or methods by which ARMOR or its subcontractors perform hereunder, other than as herein provided. ARMOR employees or agents agree to follow the policies of TCSO, State law and minimum Jail standards, detention facilities and minimum Jail standards, as well as those standards required of NCCHC and ACA accreditation.

12.2   **PERFORMANCE BOND.** ARMOR shall provide a performance bond in the amount of 100% of the first 180 days, or $2,744,486.83.

Exhibit 1

Exhibit No. 1

12.3   NOTICE. All notices or other communications required or permitted to be given under this agreement shall be in writing and shall be deemed to have been duly given if delivered personally in hand or mailed certified mail, return receipt requested, postage prepaid on the date posted, and addressed to the appropriate party at the following address or such addresses as may be given in writing to the parties:

(A)   BOCC

Tulsa County Commissioners
Chairman of the Board
500 South Denver Avenue
Tulsa, Oklahoma 74103

With a copy to TCSO:

Tulsa County Sheriff's Office
Attn: Undersheriff Tim Albin
500 South Denver Avenue
Tulsa, OK 74103

Armor Correctional Health Services, Inc.
ATTN: Bruce Teal, Chief Executive Officer
4960 S.W.72nd Ave., Ste. 400
Miami, FL 33155

With a copy to:
Armor Correctional Health Services, Inc.
ATTN: Ken Palombo, Chief Operating Officer
4960 S.W.72nd Ave., Ste. 400
Miami, FL 33155

12.4   GOVERNING LAW. This agreement and the right and obligations of the parties hereto shall be governed by, and construed according to, the laws of the State of Oklahoma.

12.5   ENTIRE AGREEMENT. This agreement, together with the RFP and ARMOR's proposal, and necessary NCCHC standards, ACA standards, PREA standards and Oklahoma Jail Standards which are hereby incorporated and adopted by reference constitutes the entire agreement of the parties and is intended as a complete and exclusive statement of promises, representations, negotiations, discussions, and agreements that have been made in connection with the subject matter hereof. No modification or amendment to this agreement shall be binding upon the parties unless the same is in writing and signed by the respective parties hereto. Should a conflict arise, the documents will be interpreted in the following order: this Agreement; Armor's Proposal; RFP amendments, addenda and answers to questions; and the RFP.

12.6   WAIVER OF BREACH. The waiver by either party of a breach or violation of any provision of this agreement shall not operate as, or be construed to be, a waiver of any subsequent breach of the same or other provision hereof.

Exhibit 1

Exhibit No. 1

12.7   ENFORCEMENT.  In the event either party incurs legal expenses or costs to enforce the terms of this agreement, the prevailing party in any proceeding hereunder shall be entitled to recover the costs such action so incurred, including, without limitation, reasonable attorney's fees.

12.8   FORCE MAJEURE.  ARMOR shall not be deemed in violation of this agreement if it is prevented from performing any of its obligations hereunder for any reason beyond its control, including Inmate disturbances, lack of adequate security escorts, acts of God, civil or military authority, acts of public enemy, war, explosions, earthquakes, floods, or any similar cause beyond the reasonable control of either party.

12.9   SEVERABILITY.  In the event of any provision of this agreement is held to been unenforceable for any reason, the unenforceability thereof shall not effect the remainder of the agreement which shall remain in full force and effect and enforceable in accordance with its terms.

12.10  CHANGES WITHIN THE LAW.  Notwithstanding anything herein to the contrary, if (i) any applicable law, statute, regulation, ordinance, standard, rule, court order or decree, policy, practice or procedure of any applicable governmental unit, agency or office (including but not limited to the federal, state or local courts, legislative bodies, and agencies, including Tulsa County Sheriff's Office and/or Tulsa County, or their respective officers or agents) is adopted, implemented, amended or changed, or if (ii) any standard of care or treatment protocol changes or evolves in any material respect, or if any new medication or therapy is introduced to treat any illness, disease or condition, and if such change, as described in either (i) or (ii), materially increases the cost to ARMOR of providing healthcare services hereunder; then ARMOR and the Tulsa County Sheriff's Office and/or Tulsa County will meet to negotiate compensation or service requirement changes.  The parties agree to meet and negotiate in good faith within thirty (30) days following the giving of notice by one party to the other party of a change (whether such change is anticipated or implemented).  If the parties fail to reach agreement regarding compensation or service requirement changes within the foregoing thirty (30) day period, then either TCSO or ARMOR may terminate their Agreement with Tulsa County upon sixty (60) days prior written notice.

12.11  LIQUIDATED DAMAGES:

(A)  It is expected that all receiving physical health and mental health screenings for inmates/detainees shall be completed within two (2) hours upon presentation to the intake nurse.  If performance falls below 90% of all medical records audited quarterly, TCSO may require ARMOR to pay fixed, agreed liquidated damages, $150.00 times the number of Inmates for whom screenings were not completed within the time frame specified for the period being reviewed.

(B) Any subsequent review resulting in performance falling below ninety percent (90%) of this standard within three (3) months of latest review requiring liquidated damages as described in this section, may, at TCSO discretion  result in liquidated damages of $200.00 times the number of Inmates for whom screenings were not completed in the current review period. A third standard of performance lower than ninety percent (90%) within six months of the latest review requiring liquidated damages as described in this

13 of 16

Exhibit 1

Exhibit No. 1

section may, at TCSO's discretion be taken at $250.00 per Inmate.  Any continued substandard findings lower than ninety percent (90%) within six months from the latest review period may, at TCSO's discretion result in penalty of $300.00 per Inmate.

(C) Liquidated damages may be assessed for failure to maintain  ACA and NCCHC accreditation.  If ARMOR fails to maintain accreditation do to acts/omissions of ARMOR, they will incur liquidated damages of $25,000 per episode if it is determined by the TCSO that ARMOR was responsible for the failure to maintain accreditation.

IN WITNESS WHEREOF, the parties have set their hands and seals hereto as the day and year first above written.

**THE BOARD OF COUNTY COMMISSIONERS OF TULSA COUNTY, OKLAHOMA ON BEHALF OF THE TULSA COUNTY SHERIFF**

Karen Keith, Chairman

ATTEST:

Pat Key, County Clerk

APPROVED AS TO FORM
ASSISTANT DISTRICT ATTORNEY

**ARMOR CORRECTIONAL HEALTH SERVICES, INC.**

BY:

Ken Plasmby, Chief Operating Officer
Armor Correctional Health Services, Inc.
4960 S.W. 72nd Ave., Ste. 400
Miami, FL, 33155

ATTEST:

Exhibit 1

Exhibit No. 1

## EXHIBIT A

### (Staffing)

| Position | FTEs | Withhold Rate |
|---|---|---|
| Health Services Administrator | 1.00 | $40.87 |
| Medical Director | 1.00 | $110.58 |
| PA/NP | 1.20 | $56.44 |
| Director of Nursing | 1.00 | $33.65 |
| RN - Infection Control/Educator/CQI | 1.00 | $28.37 |
| RN - Discharge Planner/Utilization Management | 1.00 | $28.37 |
| RN - Charge | 4.20 | $30.08 |
| RN | 2.00 | $26.49 |
| LPN | 15.30 | $19.89 |
| CMA | 8.40 | $13.93 |
| Administrative Assistant | 1.00 | $16.00 |
| Medical Records Clerk. | 1.60 | $12.00 |
| Psychiatrist/Psychologist; Psychiatric/Mid-Level | 1.00 | $132.21 |
| Mental Heath Professional (LCSW) | 3.00 | $24.04 |
| Dentist | 0.60 | $85.00 |
| Dental Assistant | 0.68 | $16.50 |

Exhibit 1

Exhibit No. 1

STATE OF OKLAHOMA
TULSA COUNTY
~~RECEIVED~~

**APPROVED**

OCT 1 2 2015

**CONTRACT EXTENSION
FISCAL YEAR 2015-2016
HEALTH SERVICES AGREEMENT**

2015 OCT -7  AM 11: 24

PAT KEY
TULSA COUNTY CLERK

This Second Amendment to the Health Services Agreement by and between Armor Correctional Health Services, Inc. (hereinafter "Armor") and the Board of County Commissioners of Tulsa County ("BOCC"), on behalf of the Tulsa County Sheriff's Office (the "Sheriff") is dated for reference purposes as of June 1, 2015.

WHEREAS, the BOCC and Armor executed an Health Services Agreement for the David L. Moss Criminal Justice Center that commenced November 1, 2013 (hereinafter "Main Agreement"), by which Armor assumed the responsibilities for provision of certain health care services as set forth in the Main Agreement; and

WHEREAS, on June 9, 2014, Armor and the BOCC entered into the First Amendment (the "First Amendment") to the Main Agreement for purposes of extending the contract for an additional year and no longer requiring the Health Services Administrator to be an RN; and

WHEREAS the BOCC and Armor wish to exercise the right set forth in Section 9.1 of the Main Agreement for an additional year,

NOW, THEREFORE, in consideration of the mutual covenants contained herein, the receipt and sufficiency of which are hereby acknowledged; it is agreed upon as follows:

1. The terms and conditions of this amendment, as set forth below, shall be effective as of July 1, 2015.
2. Pursuant to Section 9.1 of the Main Agreement, the parties hereby renew and extend for the period running from July 1, 2015 through June 30, 2016 (the "Second Renewal Period").
3. Pursuant to Section 9.1 of the Main Agreement, the base compensation renewal adjustment shall be 1.9%. Accordingly, the compensation for the Second Renewal Period shall be $5,721,909.18 annually (or $476,825.77 monthly);
4. Exhibit "A" Staffing - of the Main Agreement, RN-Discharge Planner / Utilization Management – has been amended to read – Discharge Planner / Utilization management.
5. In light of the base compensation renewal adjustment, Section 10.2 shall be amended to change the per diem rate from $1.88 to $1.92 per inmate.
6. Section number 4 of the Contract Extension, Fiscal Year 2014-2015 is deleted. Effective with this extension, the Health Services Administrator shall be a Registered Nurse.
7. Section 2.1, D, of the Main Agreement, is amended to add the following at the end of the paragraph: In the event any position goes unworked for more than 30 consecutive days, the TCSO may request a credit for all unworked hours at the applicable withhold rate for said position, notwithstanding total paid hours equals or exceeds total contracted hours.

Exhibit 2

Exhibit No. 1

8. In the calculation of total monthly paid hours, the hours that would have been worked on Armor holidays by staff members in the positions listed below will be considered paid hours and included in the total monthly paid hours. The positions include: Health Services Administrator (HSA), Medical Director, Staff Physicians, Midlevel providers, Dentist, Dental Assistant, Director of Nursing (DON), Director of Mental Health, Psychiatrist, Mental Health Administrator, Licensed Mental Health workers, and Secretarial staff.

9. In all other respects, the terms and conditions of the Main Agreement and the First Amendment shall continue unchanged and remain in full force and effect.

**Board of County**
**Commissioners of Tulsa County**

Name and Title

Date  10/12/15

**Armor Correctional Health Services, Inc.**

COO

Name and Title

Date  9/25/15

APPROVED this 12 day of October, 2015 by the **BOARD OF COUNTY COMMISSIONERS OF TULSA COUNTY.**

CHAIRMAN, Pro Tem

MEMBER

MEMBER

ATTEST:

Pat Key By Nancy
DEPUTY COUNTY CLERK

Reviewed and approved as to form and legality

District Attorney    Date  10-7-15

Exhibit 2

Exhibit No. 1

| Booking Detail | Print Me! |
|---|---|

## Identification

| | |
|---|---|
| Name | BRADSHAW, NATHAN DANIEL |
| DLM # | 1221738 |
| Booking Id | 20160308060 |
| Docket ID | 480728 |

## Inmate Information

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Race | W | Hair Color | BRO | | | Facial Hair | |
| Gender | M | Eye Color | BLU | | | Marital Status | |
| Height | 6'02" | Complexion | | | | Next of Kin | |
| Weight | 160 | Build | | | | N of K # | (000)000-0000 |
| Birth Date | ▓▓▓▓ | Birth Place | UNK | | AK | SSN | ▓▓▓▓▓ |
| Age at Booking | 32 | Street Address | 1729 S DENVER AV APT. 109 | | | Lic # | |
| Age at Release | 32 | City, State Zip | TULSA | OK | 74105 | FBI # | NONE |
| Current Age | 32 | Phone | (918)830-5821 | | | TPD # | |
| | | | | | | OSBI # | NONE |

## Arrest | Booking Information

| | | | |
|---|---|---|---|
| Arrest Date | 3/8/2016 | Booking Date | 3/8/2016 |
| Arrest Time | 18:30 | Booking Time | 19:05 |
| Arrest By | MCCLINTOCK | Booked By | nieseberg |
| Agency | TULSA POLICE DEPARTMENT | Weekend Server | False |
| OTN # | 006064855L | Custody Level | 4 |
| Est. Release | | Cell Assignment | Current Location |
| Release Date | 3/13/2016 | Release By | Christa Wood |
| Release Time | 13:32 | Release Reason | 121 - Atty/Personal Recognizance |

Booking Notes

Alerts

Trustee Status

Exhibit 3

Exhibit No. 1