## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| (1)  ANJI BRADSHAW, as Special Administrator for the Estate of Nathan Bradshaw, deceased, | |
| Plaintiff, | |
| | Case No.: 17-CV-615-TCK-FHM |
| v. | |
| (2)  ARMOR CORRECTIONAL HEALTH SERVICES INC., | **ATTORNEY LIEN CLAIMED** **JURY TRIAL DEMANDED** |
| (3)  BRUCE TEAL, in his individual capacity, | |
| (4)  JOSE ARAMAS, in his individual capacity, | |
| (5)  KENNETH PALOMBO, in his individual capacity, | |
| (6)  GINA JULES, in her individual capacity, | |
| (7)  JOHN MAY, in his individual capacity, | |
| (8)  DANA TATUM, in her individual capacity, | |
| (9)  CURTIS MCELROY, in his individual capacity, | |
| Defendants. | |

## SECOND AMENDED PETITION

Plaintiff, Anji Bradshaw, as Special Administrator for the Estate of Nathan Bradshaw, deceased, ("Estate") for the Estate's cause of action against the above-named Defendants, would state as follows:[1]

PARTIES, JURISDICTION, VENUE

1.      Anji Bradshaw is the Court appointed Special Administrator for the Estate of Nathan Bradshaw ("ESTATE") established in Tulsa County District Court, Case No. PB-2016-324.

2.      Armor Correctional Health Services, Inc. ("ARMOR") is a Florida for-profit corporation. In exchange for an annual base compensation of $5,721,909.18 from Tulsa County taxpayers, ARMOR contracted with the Tulsa County Board of County Commissioners to assume Tulsa County's state and federal law obligation to deliver mental and medical health care ("Healthcare Services") at the David L. Moss Criminal Justice Center ("DLMCJC"). [*See* Ex. 1, Health Services Agreement ("HSA"), *see also* Ex. 2, HSA Contract Extension].

3.      The HSA between ARMOR and Tulsa County required compliance with standards promulgated by the National Commission on Correctional Health Care ("NCCHC") and the American Correctional Association ("ACA").

4.      ARMOR is liable under state law for the actions of its agents and employees at the DLMCJC under a theory of *respondeat superior* consistent with the

---

[1] Plaintiff adopts and incorporates by reference the exhibits attached to the initial Petition as if fully set forth herein. *See* Fed. R. Civ. P. 10(c). Notably, ARMOR failed to include those exhibits as part of the state court pleadings when it removed the case in violation of 28 U.S.C. § 1446(a), however, ARMOR's counsel has affirmatively represented that ARMOR will correct the defective removal and have those exhibits filed immediately.

common law principles set forth by the Oklahoma Supreme Court in *Baker v. Saint Francis Hosp.*, 2005 OK 36, 126 P.3d 602.

5.      BRUCE TEAL, JOSE ARAMAS, KENNETH PALOMBO, GINA JULES, JOHN MAY, and DANA TATUM (hereinafter collectively referred to as the "Board Employees"), are or were members of ARMOR's Board of Directors, the entity with final policymaking authority for enactment and implementation of ARMOR's policies and practices. The Board members are sued in their individual capacity.

6.      CURTIS MCELROY ("MCELROY"), is or was an agent or employee of ARMOR used to staff a physician position at the DLMCJC. MCELROY is sued in his individual capacity.

7.      At all times relevant hereto, the Defendants were acting in a capacity sufficient to bring them within the statutory authority of 42 U.S.C. § 1983.

8.      Within one year of the date of loss, ESTATE timely served ARMOR with a Title 57 Notice on November 9, 2016. More than ninety (90) passed with no response from ARMOR. Thereafter, suit was timely initiated in state court. There are no additional administrative procedures for the ESTATE to exhaust.

9.      As a private corporation, ARMOR is not entitled to any exemption from liability set forth in the Oklahoma Governmental Tort Claims Act ("GTCA"), 51 O.S. § 151 *et seq*. *See Sullins v. American Med. Resp. of Okla.*, 2001 OK 20, 23 P.3d 259.

10.     The events described below occurred in Tulsa County, Oklahoma, making venue proper, complete diversity exists, ESTATE seeks in excess of $75,000.00, and this

Court has original federal question jurisdiction arising from the allegations in this pleading.

**STATEMENT OF FACTS**

**THE PUBLIC-PRIVATE BUSINESS MODEL**

11.   ARMOR has a business model that generates revenue through governmental contracts premised on "capitated financing." Through these contracts, ARMOR assumes responsibility for the government's obligation to provide Healthcare Services to people who are not free to seek out healthcare for themselves.

12.   Under a contract using a "capitated financing" approach, also known as a "full-risk" contract, the contractor bears the full risk that the medical care costs may exceed the presumptive cost-per-prisoner estimate that dictates the agreed-upon contract price. Because assumptions regarding adequate staffing, costs for medication, and other relevant variables are all factored into the medical-cost-per-prisoner amount that serves as the basis for the pricing of the contract, and the contractor agrees to receive a fixed sum of money, regardless of how much or how little care it ultimately must provide to prisoners in performing the contract, the contractor's profit margin directly depends upon the amount of care it provides.

13.   To obtain these contracts, ARMOR submits bids to government vendors like Tulsa County. If awarded the contract, ARMOR provides Healthcare Services in return for payment by the government vendor.

14.   For ARMOR to achieve positive revenue from its contract, ARMOR must provide Healthcare Services at a net profit.

4

15.     To achieve net profits, ARMOR implements policies, procedures, customs, or practices to reduce the cost of Healthcare Services in a manner that will maintain or increase its profit margin.

16.     There are no provisions in ARMOR's contract with Tulsa County creating or establishing any mandatory minimum expenditure for the provision of Healthcare Services.

17.     ARMOR's contract with Tulsa County incentivized cost-cutting measures in the delivery of Healthcare Services at the DLMCJC to benefit ARMOR's shareholders.

### IN-CUSTODY SUICIDE

18.     According to the United States Department of Justice, suicide is the leading cause of death in jails, accounting for 34% of jail deaths in 2013. *See* U.S. Dept. of Justice, Office of Justice Programs, Bureau of Justice Statistics, MORTALITY IN LOCAL JAILS AND STATE PRISONS, 2000-2013 – STATISTICAL TABLES, Aug. 2015.[2]

19.     Suicide has been the leading cause of death in local jails each year since 2000, the first year the Department of Justice began collecting data. From 2009 to 2013, the suicide rate in jail facilities increased by 23%.

20.     From 2000 to 2013, suicide has been a more prevalent cause of death in local jail facilities than heart disease, AIDS-related illness, cancer, liver disease, and respiratory disease.

21.     The vast majority of suicides occur in a jail cell, usually when the person is alone and unsupervised. Suicides often involve bed sheets.

---

[2] *See* https://www.bjs.gov/content/pub/pdf/mljsp0013st.pdf (last visited March 7, 2017)

22. On March 13, 2016, records indicate that Nathan Bradshaw ("BRADSHAW") was discovered in his cell at the DLMCJC hanging with a bed sheet wrapped around his neck. He died from his injuries three days later.

23. As described in greater detail below, BRADSHAW's death was preventable and caused by or contributed to by acts or omissions that are fairly traceable to ARMOR, its agents, and employees, its policies, practices, customs and usages, and individual acts or omissions committed by its agents or employees.

### ADMISSION AND RECEIVING SCREENING

#### MARCH 8, 2016

24. Records show that BRADSHAW was arrested and booked into the DLMCJC at 7:05 p.m. [*See* Ex. 3, Booking Detail].

25. In two minutes, from 8:09 p.m. to 8:11 p.m., records show that BRADSHAW was given a 152-question Receiving Screening by a Licensed Practical Nurse ("LPN") employed by ARMOR. Many of questions were not fully answered. [*See* Ex. 4, Receiving Screening].

26. A "receiving screening" is defined by the NCCHC as a process of structured inquiry and observation intended to prevent newly arrived inmates who pose a threat to their own or others' health, mental health, or safety from being admitted to the general population, and to get them rapid medical or mental health care. *See* NCCHC Standard, MH-E-02 (Essential).

27. During the Receiving Screening, BRADSHAW alerted ARMOR's LPN of the following: (1) that he used heroin daily; (2) that he recently injected drugs; (3) that he

had received mental health treatment for bipolar disorder, manic depressive disorder, and borderline personality disorder; (4) that he had been inpatient at 12 & 12, a mental health facility for substance abuse; (5) that he currently has problems with heroin; and (6) that he had previously been in the facility in 2015. [*See* Ex. 4, pp. 2, 4-6].

28.     Records from BRADSHAW's prior detentions at the DLMCJC were available to ARMOR's employees during the Receiving Screening. Those records included a section titled, "Alerts."

29.     Records show that BRADSHAW's Alert history included the following: (1) withdrawal history; (2) seizure precautions; and (3) chronic care – neurology. [*See* Ex. 5, Alerts].

30.     Records show the LPN who conducted the Receiving Screening approved BRADSHAW for assignment in general population. [*See* Ex. 4, p. 7].

31.     During admission, records also show that BRADSHAW completed a Classification Evaluation Questionnaire ("CEQ"). The CEQ notes that BRADSHAW was previously detained at the DLMCJC, and that he suffered from a mental, physical or developmental disability. [*See* Ex. 6, Classification Evaluation Questionnaire].

32.     At 10:46 p.m., records show that BRADSHAW was initially assigned to cell DLM-M-1-J14-B. This cell is located in a general population housing unit. [*See* Ex. 7, Inmate Classification].

### INADEQUATE TREATMENT PROTOCOLS AND INDIFFERENCE TO ADHERENCE

#### MARCH 9, 2016

33.     At 6:16 a.m., records show that BRADSHAW was placed on an "Opiate Detox Prevention Protocol" on telephone orders from a Nurse Practitioner. [*See* Ex. 8].

34.     Records show an LPN also entered a Clonidine prescription for BRADSHAW at 6:17 a.m. on orders from Dr. Thomas Gable, Jr. [*See* Ex. 8, Medical History, *see also* Ex. 15, Medication Orders]. The Clonidine orders instructed ARMOR to administer the medication twice a day for four (4) days. [*See* Ex. 15].

35.     Records show that ARMOR was scheduled to administer the first dose of Clonidine to BRADSHAW at 12:26 p.m., but failed to do so because BRADSHAW was "in court." [*See* Ex. 11]. The Jail Shift Log shows BRADSHAW returning to the housing unit at 1:18 p.m. [*See* Ex. 12].

36.     There is no indication from the MAR that ARMOR provided BRADSHAW with Clonidine on March 9, 2016. [*See* Ex. 11].

37.     At 6:17 a.m., records also show that ARMOR ordered a Drug and Alcohol Assessment with a follow-up each day for six (6) days. [*See* Ex. 8, p. 2, Medical History, March 2016]. The subsequent flowsheet used by ARMOR was labeled "CIWA", or Clinical Institute Withdrawal Assessment.

38.     A CIWA is used to assess withdrawal from alcohol, but BRADSHAW denied using alcohol during the receiving screening. ARMOR did not assess BRADSHAW using a Clinical Opiate Withdrawal Scale ("COWS"), which is used to evaluate opiate withdrawal.

39.     Although ordered at 6:17 a.m., ARMOR did not initiate the CIWA until approximately 38 hours later, on March 10, 2016 at 8:18 p.m. [*See* Ex. 8, p. 2].

40.     By the end of March 9, 2016, records show that ARMOR had failed to administer 2 of 2 doses of Clonidine.

<u>MARCH 10, 2016</u>

41.     Records show that BRADSHAW received his first dose of Clonidine at 8:53 a.m. [*See* Ex. 11].

42.     At 4:39 p.m., records show that BRADSHAW was evaluated by ARMOR for a painful left forearm that included swelling, and redness. [*See* Ex. 9, Sick Call]. The record indicates that BRADSHAW told the physician that he missed a vein when attempting to use drugs on March 8, 2016.

43.     In response, ARMOR put BRADSHAW on a regime of opiate-based Codeine for administration three times a day for five (5) days [*See* Ex. 9].

44.     ARMOR ordered opiated-based narcotics for BRADSHAW despite records indicating that it had already initiated an Opiate Detox Prevention Protocol on the morning of March 9, 2016 that did not include opiate-based medication.

45.     Records show that ARMOR checked-out Codeine to administer to BRADSHAW on the following dates and times:

(1) March 10, 2016 at 4:30 p.m.;

(2) March 10, 2016 at 9:00 p.m.;

(3) March 11, 2016 at 5:00 a.m.;

(4) March 11, 2016 at 1:00 p.m.;

(5) March 11, 2016 at 10:00 p.m.;

(6) March 12, 2016 at 9:00 a.m.;

(7) March 12, 2016 at 1:07 p.m.; and

(8) March 12, 2016 at 9:00 p.m.

[*See* Ex. 10, Controlled Substance Inventory]

46.     The Controlled Substance Inventory shows that ARMOR checked out one dose of opiate-based Codeine for administration to BRADSHAW before his CIWA at 8:18 p.m., but it does not appear on the MAR. The disposition of this dose of Codeine is not accounted for in the MAR or in the Controlled Substance Inventory.

47.     Records show that ARMOR administered the first CIWA 8:18 p.m. The CIWA noted that BRADSHAW presented with mild nausea and no vomiting, mild anxiety, mild itching, pins and needles, burning or numbness, and moderately severe hallucinations. [*See* Ex. 8, pp. 2-4].

48.     The MAR shows that BRADSHAW was not medically fit to receive his second dose of Clonidine at 9:09 p.m., but the MAR does show administration of the first dose of Codeine at 11:34 p.m. [*See* Ex. 11].

49.     By the end of March 10, 2016, records show that ARMOR had not administered 3 of the 4 doses of Clonidine, and the records do not account for 2 of the 3 doses of Codeine.

## MARCH 11, 2016

50.     The MAR shows that BRADSHAW received his second dose of Codeine at 5:43 a.m. [*See* Ex. 11].

51.     At 6:48 a.m., records show that ARMOR repeated the CIWA. The CIWA noted moderate tremors, some agitation, and mild joint discomfort. [*See* Ex. 8, pp. 4-6].

52.     At 9:50 a.m., the MAR shows that BRADSHAW received his second dose of Clonidine. [*See* Ex. 11].

53.     Records show that ARMOR repeated the CIWA at 12:16 p.m. The CIWA noted mild nausea with no vomiting, mild hallucinations, and mild sensitivity to light. [*See* Ex. 8, pp. 6-8].

54.     Although the Controlled Substance Inventory noted that a dose of Codeine was checked out for administration to BRADSHAW at 1:00 p.m., the MAR does not identify any Codeine given near this time. The disposition of this dose of Codeine is not accounted for in the MAR or in the Controlled Substance Inventory.

55.     The MAR shows that BRADSHAW was not medically fit to receive his third dose of Clonidine at 9:20 p.m.

56.     The MAR shows that BRADSHAW did not receive his third dose of Codeine until 11:31 p.m. [*Id*]. This is the fifth dose of Codeine listed on the Controlled Substance Inventory.

57.     By the end of March 11, 2016, records show that ARMOR had not administered 4 of the 6 doses of Clonidine, and the records do not account for 3 of the 6 doses of Codeine.

## MARCH 12, 2016

58.     Although the Controlled Substance Inventory noted that a dose of Codeine was checked out for administration to BRADSHAW at 9:00 a.m., the MAR does not

11

identify any Codeine given near this time. The disposition of this dose of Codeine is not accounted for in the MAR or in the Controlled Substance Inventory.

59.     There is no record in the MAR of BRADSHAW receiving any Clonidine at all on March 12, 2016. [*See* Ex. 11].

60.     There is no record of ARMOR conducting a CIWA on the morning or afternoon of March 12, 2016 as originally ordered.

61.     Records show that BRADSHAW refused lunch at 12:32 p.m. [*See* Ex. 12, Jail Shift Report].

62.     The MAR shows that BRADSHAW did not receive his fourth dose of Codeine until 1:25 p.m. [*See* Ex. 11, p. 3].  This is the seventh dose of Codeine listed on the Controlled Substance Inventory.

63.     Sometime before 4:01 p.m., records show that BRADSHAW submitted an Inmate Request Form that was received by Detention Officer Oyedele. It reads:

> I need to speak to someone in Mental Health. My anxiety is unbearable and has kept me from sleeping and caused me to pace around restlessly and hear things.

[*See* Ex. 13, Inmate Request Form; *see also* Ex. 12, Jail Shift Report].

64.     There is no documented response to the request.

65.     Records show that ARMOR repeated the CIWA at 6:42 p.m. The CIWA noted intermittent nausea but no anxiety. [*See* Ex. 8, pp. 8-10].

66.     Although the Controlled Substance Inventory notes an eighth dose of Codeine was checked out for administration to BRADSHAW at 9:00 p.m., the MAR does

not identify any Codeine given near this time. The disposition of this dose of Codeine is not accounted for in the MAR or in the Controlled Substance Inventory.

67.    By the end of March 12, 2016, records show that ARMOR had not administered 6 of the 8 doses of Clonidine, and the records do not account for 5 of the 9 doses of Codeine.

## CONCLUSION OF DETENTION

68.    Records indicate that BRADSHAW left the housing unit for medical at 9:21 p.m., and returned at 10:05 p.m. Records indicate the housing unit was locked down at 10:31 p.m. [*See* Ex. 12].

69.    Records indicate the Detention Officer failed to perform sight checks of BRADSHAW's cell in violation of Oklahoma Jail Standard 310:670-5-2(3). At approximately 12:11 a.m. on March 13, 2016, records indicate the new guard on duty found BRADSHAW unresponsive and hanging in his cell.

70.    The Detention Officer admitted that he made phantom entries into the computer system to give the appearance that sight checks were done, when he knew the opposite was true.

71.    Records indicate that BRADSHAW was transported to OSU Regional Medical Center at 00:32 hours on March 13, 2016. [*See* Ex. 14, Emergency Department Transfer Notification].

72.    The inconsistent use of Clonidine and Codeine, particularly the failure to adhere to the treatment regime relative to a person known to have an opioid addiction, in

combination with inadequate assessments, and delayed mental health responses, substantially increased the risk of harm to BRADSHAW.

73.     BRADSHAW remained at OSU in the ICU until March 16, 2016. He is survived by his mother, father, siblings, and numerous friends and family members.

### POLICYMAKING MAKING AND INDIFFERENCE TO CORPORATE PRACTICES

74.     Board Employees had final policymaking authority relative to ARMOR's operation and implementation of the HSA.

75.     In furtherance of its capitated financing contract, Board Employees adopted written policies or unwritten practices dictating that care was provided based on medical cost and not medical need. This practice evinces deliberate indifference by displacing constitutional obligations in favor of corporate profits.

76.     These policies or practices include, but are not limited to the following:

    a)     chronic reliance on lower-level providers *e.g.*, practical nurses instead of nurses or physicians, to make threshold decisions regarding care or elevating care;

    b)     chronic reliance on temporary staff, who lack training or experience in a correctional setting, to fill medical vacancies;

    c)     chronic understaffing that impairs the ability of existing staff to complete contracted tasks in a timely manner;

    d)     chronic understaffing that prevents ARMOR from timely responding to inmate requests for mental health care;

14

    e)      absence of accountability in the administration of physician prescribed medication;

    f)      longstanding tolerance for routine lapses in continuity of care in the administration of medication;

    g)      tolerating physician use of alcohol withdrawal protocols (CIWA), for arrestees detoxing from opioid use (COWS);and

    h)      chronic failure to correct known deficiencies in the delivery if adequate healthcare services which were previously identified to ARMOR by governmental partners in Oklahoma and other jurisdictions.

77.    Board Employees received reports from various auditors and inspectors in connection with the performance of ARMOR's contracts, and those reports have detailed deficiencies in the adequacy of healthcare provided by ARMOR.

78.    These reports provided Board Employees with actual knowledge of the deficiencies in ARMOR's delivery of healthcare, and despite receiving that information, the Board Employees failed to adequately address those deficiencies.

79.    ARMOR relied upon these policies or practices in executing the HSA in Tulsa County, and the application of these policies or practices substantially increased the risk of suicide to BRADSHAW.

### ABSENCE OF FEDERALISM BARRIER TO *MONELL* CLAIM

80.     The federalism concern that compelled the *Monell* Court to erect a bar against *respondeat superior* liability for 1983 claims against municipal entities has no application here. *See e.g.*, *Shields v. Illinois Dept. of Corrections*, 746 F.3d 782, 795 (7th Cir. 2014) ("[A] new approach may be needed for whether corporations should be insulated from *respondeat superior* liability under § 1983.").

### STATEMENT OF CLAIMS

### DELIBERATE INDIFFERENCE - CONDITIONS OF CONFINEMENT
### ENTITY CLAIM
### 42 U.S.C. § 1983

81.     ESTATE adopts and incorporates by reference the preceding paragraphs as if fully set forth herein.

82.     ARMOR, through its written policies or unwritten practices, exhibited deliberate indifference to the provision of medical care at the DLMCJC that resulted in the deprivation of BRADSHAW's rights as secured by the Fourteenth Amendment to the United States Constitution for which ARMOR is liable pursuant to 42 U.S.C. § 1983.

### DELIBERATE INDIFFERENCE - CONDITIONS OF CONFINEMENT
### *RESPONDEAT SUPERIOR* CLAIM
### 42 U.S.C. § 1983

83.     ESTATE adopts and incorporates by reference the preceding paragraphs as if fully set forth herein.

84.     ARMOR, through its agents and/or employees, exhibited deliberate indifference to the provision of medical care at the DLMCJC that resulted in the

deprivation of BRADSHAW's rights as secured by the Fourteenth Amendment to the United States Constitution for which ARMOR is liable pursuant to 42 U.S.C. § 1983.

### DELIBERATE INDIFFERENCE - CONDITIONS OF CONFINEMENT
### INDIVIDUAL CLAIM
### 42 U.S.C. § 1983

85.     ESTATE adopts and incorporates by reference the preceding paragraphs as if fully set forth herein.

86.     TEAL, ARAMAS, PALOMBO, JULES, MAY, and TATUM exhibited deliberate indifference to the provision of medical care at the DLMCJC that resulted in the deprivation of BRADSHAW's rights as secured by the Fourteenth Amendment to the United States Constitution for which these Defendants are liable pursuant to 42 U.S.C. § 1983.

### DELIBERATE INDIFFERENCE
### INDIVIDUAL CLAIM
### 42 U.S.C. § 1983

87.     ESTATE adopts and incorporates by reference the preceding paragraphs as if fully set forth herein.

88.     MCELROY exhibited deliberate indifference to the provision of medical care at the DLMCJC that resulted in the deprivation of BRADSHAW's rights as secured by the Fourteenth Amendment to the United States Constitution for which these Defendants are liable pursuant to 42 U.S.C. § 1983.

### SURVIVAL ACT
### STATE LAW

89.     ESTATE adopts and incorporates by reference the preceding paragraphs as if fully set forth herein.

90.     Pursuant to 12 O.S. § 1051, the decedent's right of survival arising from the wrongful and intentional conduct by ARMOR, Board Employees, and McELROY, is held by Anji Bradshaw, the legal representative of the Estate of Nathan Bradshaw. Plaintiff, Anji Bradshaw demands all damages recoverable under the Act, including damages for funeral and medical expenses and conscious pain and suffering, as well as any other damages recoverable under the Act.

### WRONGFUL DEATH
### STATE LAW

91.     ESTATE adopts and incorporates by reference the preceding paragraphs as if fully set forth herein.

92.     ESTATE's claims are actionable under the Oklahoma Wrongful Death Act, 12 O.S. § 1053. Such claims are distinguishable from Survival Actions in Oklahoma. *See Boler v. Security Health Care, L.L.C.*, 2014 OK 80, 336 P.3d 468.

93.     As a direct result of the wrongful acts of ARMOR, Board Employees, and McELROY, the next of kin of the decedent is entitled to incurred burial expenses, loss of the pecuniary value of services expected to be performed by the decedent and other damages recoverable under the wrongful death statute including, but not limited to solatium damages.

## NEGLIGENCE
### STATE LAW

94.     ESTATE adopts and incorporates by reference the preceding paragraphs as if fully set forth herein.

95.     ARMOR owed a duty of reasonable care in the management of BRADSHAW's medical condition consistent with its contract and the standards promulgated by the Oklahoma State Department of Health Jail Inspection Division, the ACA standards for Adult Local Detention Facilities, and standards published by the NCCHC.

96.     ARMOR breached that duty through the conduct detailed above, which includes, but is not limited to, the failure to conduct a complete receiving screening, the failure to base the classification recommendation upon a complete receiving screening, the failure to conduct a COWS, the use of a CIWA to assess an opiate addict, the failure to adhere to prescribed medications used as part of an opiate withdrawal protocol, the inconsistent administration of medication, the use of opiate-based Codeine while implementing a non-opioid withdrawal protocol, and the failure to deliver mental health care in a timely manner.

97.     The ESTATE has suffered damages as a direct and proximate result of these acts or omissions, for which ARMOR is liable.

**REQUEST FOR RELIEF**

98.     Based on the foregoing allegations, the ESTATE respectfully requests the following relief:

A.     Compensatory damages against all Defendants in an amount that exceeds $75,000.00;

B.     Punitive damages against all Defendants in an amount that exceeds $75,000.00;

C.     Nominal damages against all Defendants for the deprivation of rights secured by the constitution or laws of the United States;

D.     Declaratory judgment determining that Defendants' acts or omissions violated the constitutional rights of Plaintiff's decedent;

E.     An award of reasonable attorney's fees and costs;

F.     Any other relief permitted by law;

G.     Any other relief the Court deems just and equitable.

Respectfully submitted,

BRYAN & TERRILL

By:     *s/J. Spencer Bryan*
J. Spencer Bryan, OBA # 19419
BRYAN & TERRILL LAW, PLLC
9 East 4th St., Suite 307
Tulsa, OK 74103
Tele:   (918) 935-2777
Fax:   (918) 935-2778
Email:  jsbryan@bryanterrill.com
*Attorneys for the Estate of Nathan Bradshaw*

## **CERTIFICATE OF SERVICE**

I hereby certify that on January 15, 2018, I served the foregoing on the following persons:

Mr. Josh Romero
jromano@johnsonhanan.com

*J. Spencer Bryan*
J. Spencer Bryan