# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF OKLAHOMA

ANJI BRADSHAW, as Special Administrator for the Estate of Nathan Bradshaw,

    Plaintiff,

v.

ARMOR CORRECTIONAL HEALTH SERVICES, INC.,

    Defendant,

Case No. 17-CV-615-TCK-FHM

## OPINION AND ORDER

Before the Court is the Motion to Dismiss filed by Defendant Armor Correctional Health Services, Inc. ("Armor"). Doc. 18. Armor seeks dismissal of the Second Amended Complaint filed by Plaintiff Anji Bradshaw. Plaintiff opposes the motion. Doc. 30.

**I. Introduction**

This lawsuit arises from the March 13, 2016, death of Plaintiff's 19-year-old son, Nathan Bradshaw ("Bradshaw"), who committed suicide while incarcerated at the David L. Moss Criminal Justice Center ("DLM")—also known as the Tulsa County Jail. Pursuant to 42 U.S.C. § 1983 and the Fourteenth Amendment, Plaintiff asserts federal claims of "conditions of confinement entity" and "conditions of confinement *respondeat superior*" against Armor based on the alleged deliberate indifference of Armor and its employees or agents. Doc. 16 at 16.[1] Plaintiff also asserts

---

[1] The Second Amended Complaint also asserted claims against six Armor employees and/or agents. Subsequently, Plaintiff voluntarily dismissed her claims against the individual defendants. Docs. 101, 108.

Oklahoma state law claims of negligence, wrongful death and "survival" against Armor, and she seeks actual and punitive damages. *Id.* at 18-19. Armor moved to dismiss Plaintiff's claims pursuant to Fed. Rule Civ. P. 12(b)(6).[2]

## II. Applicable Law

In considering a motion to dismiss under Rule 12(b)(6), a court must determine whether the claimant has stated a claim upon which relief may be granted. A motion to dismiss is properly granted when a complaint provides no more than "labels and conclusions, and a formulaic recitation of the elements of a cause of action." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). A complaint must contain enough "facts to state a claim to relief that is plausible on its fact," and the factual allegations "must be enough to raise a right to relief above the speculative level." *Id.* (citations omitted). "Once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Id.* at 562.

While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, "a plaintiff's obligation to provide the grounds of his entitle[ment] to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 555 (internal quotations omitted). For the purpose of making the dismissal determination, a court must accept as true all the well-pleaded allegations, even if doubtful in fact, and must construct the allegations in the light most favorable to the claimant. *Id.* at 555; *Alvarado v. KOB-TV, L.L.C.*, 493 F.3d 120, 1215 (10th Cir. 2007); *Moffett v. Haliburton energy Servs., Inc.*, 291 F.3d 1227, 1231 (10th Cir. 2002).

---

[2] The Second Amended Complaint also named as individual defendants Armor employees and/or board members Gina Jules, John May, Kenneth Palombo, Dana Tatum, Bruce Teal and Jose Aramas. The individual defendants filed a Rule 1(b)(6) Motion to Dismiss. Doc. 23. Subsequently, Plaintiffs filed a Partial Motion to Dismiss, which the Court granted on March 26, 2019. Docs. 101, 108.

**III. Allegations of the Complaint**

Pursuant to a Health Services Agreement ("HSA"), Armor, a Florida for-profit corporation, contracted with the Tulsa County Board of County Commissioners to assume Tulsa County's state and federal law obligation to deliver mental and medical health care ("Healthcare Services") at the DLM. Doc. 16, Second Amended Petition at 2. Plaintiff alleges that Armor is liable under state law for the actions of its agents and employees at DLM under a theory of *respondeat superior* consistent with common law principles set forth by the Oklahoma Supreme Court in *Baker v. Saint Francis Hosp.*, 126 P.3d 601 (Okla. 2005). *Id*. at 2-3. She contends that, as a private corporation, Armor is not entitled to any exemption from liability set forth in the Oklahoma Governmental Tort Claims Act ("GTCA"), 51 O.S. §151 *et seq. Id.* at 3.

Armor has a business model that generates revenue through government contracts premised on "capitated financing," or "full-risk" contracts. *Id.* at 4. Under this approach, the contractor bears the full risk that the medical care costs may exceed the presumptive cost-per-prisoner estimate that dictates the agreed-upon contract price. *Id*. Assumptions regarding adequate staffing, costs for medication and other relevant variables are all factored into the medical-cost-per-prisoner amount that serves as the basis for the pricing of the contract, and the contractor agrees to receive a fixed sum of money, regardless of how much or how little care it ultimately must provide to prisoners in performing the contract. As a result, the contractor's profit margin directly depends upon the amount of care it provides. *Id.* To achieve net profits, Armor implements policies, procedures, customs, or practices to reduce the cost of healthcare services in a manner that will maintain or increase its profit margin. *Id.* at 5. There are no provisions in Armor's contract with Tulsa County creating or establishing any mandatory minimum expenditure for the provision of healthcare services. *Id.*

Plaintiff alleges that board members of Armor, in furtherance of its capitated financing contract, adopted written policies or unwritten practices dictating that care was provided based on medical cost and not medical need. *Id.* at 14. This practice, which "evinces deliberate indifference by displacing constitutional obligations in favor of corporate profits," includes:

- chronic reliance on lower-level providers *e.g.*, practical nurses instead of nurses or physicians, to make threshold decisions regarding care or elevating care

- chronic reliance on temporary staff who lack training or experience in a correction setting, to fill medical vacancies;

- chronic understaffing that impairs the ability of existing staff to complete contracted tasks in a timely manner;

- chronic understaffing the prevents Armor from timely responding to inmate requests for mental health care;

- absence of accountability in the administration of physician prescribed medication;

- longstanding tolerance for routine lapses in continuity of care in the administration of medication;

- tolerance of physicians' use of alcohol withdrawal protocols (CIWA) for arrestees detoxing from opioid use instead of opioid withdrawal protocols (COWS); and

- chronic failure to correct known deficiencies in the delivery of adequate healthcare service which were previously identified to Armor by governmental partners in Oklahoma and other jurisdictions.

*Id.* at 14-15.

Plaintiff further alleges that Board Employees received reports from various auditors and inspectors in connection with the performance of Armor's contracts, and those reports have detailed deficiencies in the adequacy of healthcare provided by Armor. *Id.* at 15. These reports provided board employees with actual knowledge of the deficiencies in Armor's delivery of healthcare, and despite receiving that information, the Board Employees failed to adequately address those deficiencies. *Id.* Armor relied upon these policies or practices in executing the HSA,

4

and the application of these policies or practices substantially increased the risk of suicide to Bradshaw. *Id.* Plaintiff alleges the federalism concern that compelled the *Monell* Court to erect a bar against *respondeat superior* liability for 1983 claims against municipal entities has no application in this case. *Id.* at 16 (citing *Shields v. Illinois Dept. of Corrections*, 746 F.3d 782, 95 (7th Cir. 2014).

The Complaint alleges that Bradshaw was arrested and booked into DLM at 7:15 p.m. on March 8, 2016. *Id.* at 6. Records show that in two minutes, from 8:09 p.m. to 8:11 p.m., he was given a 152-question Receiving Screening by an Armor Licensed Practical Nurse ("LPN"). *Id.* Many of the questions were not fully answered. *Id.* A "receiving screening" is defined by the NCCHC as a process of structured inquiry and observation intended to prevent newly arrived inmates who pose a threat to their own or others' health, mental health, or safety from being admitted to the general population, and to get them rapid medical or mental health care. *Id.*

During the receiving screening, Bradshaw alerted the LPN that he used heroin daily; had recently injected drugs; had received mental health treatment for bipolar disorder, manic depressive disorder and borderline personality disorder; had been an inpatient at 12 & 12, a mental health facility for substance abuse; currently had problems with heroin; and had previously been in the facility in 2015. *Id.* at 6-7. Records from Bradshaw's prior detentions at DLM were available to Armor's employees during the Receiving Screening, and those records included a section titled "Alerts." *Id.* at 7. Bradshaw's Alert history included a withdrawal history, seizure precautions and chronic care-neurology. *Id.* Records show that the LPN who conducted the Receiving Screening approved Bradshaw for assignment to the general population. *Id.*

Records also show that during admission, Bradshaw completed a Classification Evaluation Questionnaire ("CEQ"), which noted that he had previously been detained at DLM and that he

5

suffered from a mental, physical or developmental disability. *Id.* Bradshaw was initially assigned to a cell located in a general population housing unit. *Id.* He was placed on an "Opiate Detox Prevention Protocol" on telephone orders from a Nurse Practitioner. *Id.* at 8. An LPN also entered a Clonidine prescription for Bradshaw on orders from Dr. Thomas Gable, Jr. *Id.* The Clonidine orders instructed Armor to administer the medication twice a day for four days. *Id.*

Armor was scheduled to administer the first dose of Clonidine to Bradshaw at 12:26 p.m. on March 9, 2016, but failed to do so because Bradshaw was "in court." *Id.* Records show that Armor ordered a Drug and Alcohol Assessment with a follow-up each day for six days. *Id.* The subsequent flowsheet used by Armor was labeled "CIWA" (Clinical Institute Withdrawal Assessment). *Id.* A CIWA is used to assess withdrawal from alcohol, but Bradshaw denied using alcohol during the receiving screening. *Id.* Armor did not assess Bradshaw using a Clinical Opiate Withdrawal Scale ("COWS"), which is used to evaluate opiate withdrawal. *Id.* Although the CIWA was ordered at 6:17 a.m., Armor did not initiate the CIWA until approximately 38 hours later, on March 10, 2016, at 8:18 p.m. *Id.* at 9.

Bradshaw received his first dose of Clonidine at 8:53 a.m. on March 10, 2016. *Id.* At 4:39 p.m. that day, he was evaluated by Armor for a painful left forearm that included swelling and redness. *Id.* He told the physician that he missed a vein when attempting to use drugs on March 8, 2016. *Id.* In response, Armor put Bradshaw on a regime of opiate-based Codeine for administration three times a day for five days. *Id.* Armor ordered opiate-based narcotics for Bradshaw despite records indicating an Opiate Detox Prevention Protocol on the morning of March 9 that did not include opiate-based medication. *Id.* Records show that Armor checked out Codeine to administer to Bradshaw on March 10, 2016 at 4:30 p.m. and 9 p.m.; March 11, 2016 at 5 a.m., 1 p.m. and 10 p.m.; and March 12, 2016 at 9 a.m., 1:07 p.m. and 9 p.m. *Id.* at 9-10.

The Controlled Substance Inventory shows that Armor checked out one dose of opiate-based Codeine for administration to Bradshaw before his CIWA at 8:18 p.m., but it does not appear on the Medical Administration Record ("MAR"). *Id.* at 10. The disposition of this dose of Codeine is not accounted for in the MAR or in the Controlled Substance Inventory. *Id.*

Records show that Armor administered the first CIWA of Bradshaw at 8:18 p.m. *Id.* The CIWA noted that Bradshaw presented with mild nausea, no vomiting, mild anxiety, mild itching, pins and needles, burning or numbness and moderately severe hallucinations. *Id.* The MAR shows that Bradshaw was not medically fit to receive his second dose of Clonidine at 9:09 p.m., but that the first dose of Codeine was administered at 11:34 p.m. *Id.* Records show that by the end of March 10, 2016, Armor had not administered three of the four doses of Clonidine, and the records do not account for two of the three doses of Codeine. *Id.*

The MAR shows that Bradshaw received his second dose of Codeine at 5:43 a.m. on March 11, 2016. *Id.* At 6:48 a.m., Armor repeated the CIWA, which noted moderate tremors, some agitation and mild joint discomfort. *Id.* at 11. At 9:50 a.m., Bradshaw received his second does of Clonidine. *Id.* Armor repeated the CIWA at 12:16 p.m. *Id.* The CIWA noted mild nausea with no vomiting, mild hallucinations and mild sensitivity to light. *Id.* Although the Controlled Substance Inventory noted that a dose of Codeine was checked out for administration to Bradshaw at 1 p.m., the MAR does not identify any Codeine given near this time. *Id.* The disposition of this dose of Codeine is not accounted for in the MAR or in the Controlled Substance Inventory. *Id.* The MAR shows that Bradshaw was not medically fit to received his third dose of Clonidine at 9:20 p.m., and did not receive his third dose of Codeine until 11:31 p.m. *Id.* This was the fifth dose of Codeine listed on the Controlled Substance Inventory. *Id.* By the end of March 11, 2016,

Armor had not administered four of the six doses of Clonidine, and the records do not account for three of the six doses of Codeine. *Id.*

The Controlled Substance Inventory noted that a dose of Codeine was checked out for administration to Bradshaw at 9 a.m. on March 12, 2016, but the MAR does not identify any Codeine given near this time. *Id.* at 11-12. The disposition of this dose of Codeine is not accounted for in the MAR or in the Controlled Substance Inventory. *Id.* at 12.

There is no record in the MAR that Bradshaw received any Clonidine at all on March 12, 2016, nor is there any record of Armor conducting a CIWA on the morning or afternoon of March 12, 2016, as originally ordered. *Id.* Records show that Bradshaw refused lunch at 12:32 p.m., and that he did not receive his fourth dose of Codeine until 1:25 p.m. *Id.* This was the seventh dose of Codeine listed on the Controlled Substance Inventory. *Id.*

Sometime before 4:01 p.m., Bradshaw submitted an Inmate Request Form that was received by Detention Officer Oyedele. *Id.* It reads:

> I need to speak to someone in Mental Health. My anxiety is unbearable and has kept me from sleeping and caused me to pace around restlessly and hear things.

*Id.* There is no documented response to the request. *Id.* ARMOR repeated the CIWA at 6:42 p.m. The CIWA noted intermittent nausea but no anxiety. *Id.*

Although the Controlled Substance Inventory notes an eighth dose of Codeine was checked out for administration to Bradshaw at 9 p.m., the MAR does not identify any Codeine given near this time. *Id.* at 12-13. Records show that by the end of March 12, 2016, Armor had not administered six of the eight doses of Clonidine, and the records do not account for five of the nine doses of Codeine. *Id.* at 13.

Records indicate that Bradshaw left the housing unit for medical at 9:21 p.m. and returned at 10:05 p.m. *Id.* The housing unit was locked down at 10:31 p.m. *Id.*

8

Records indicate the Detention Officer failed to perform sight checks of Bradshaw's cell, in violation of Oklahoma Jail Standard 310:670-5-2(3). At approximately 12:11 a.m. on March 13, the new guard on duty found Bradshaw unresponsive and hanging in his cell. *Id.* The Detention Officer admitted that he made phantom entries into the computer system to give the appearance that sight checks were done, when he knew the opposite was true. *Id.*

Bradshaw was transported to OSU Regional Medical Center at 00:32 hours on March 13, 2016. *Id.* The inconsistent use of Clonidine and Codeine, particularly the failure to adhere to the treatment regime relative to a person known to have an opioid addiction, in combination with inadequate assessments, and delayed mental health responses, substantially increased the risk of harm to Bradshaw. *Id.* at 13-14. Bradshaw remained at OSU in the ICU until March 16, 2016. *Id.* He is survived by his mother, father, siblings and numerous friends and family members. *Id.* Armor relied upon these policies or practices in executing the HSA in Tulsa County, and the application of these policies or practices substantially increased the risk of suicide to Bradshaw. *Id.* at 15.

Pursuant to 42 U.S.C. § 1983, Plaintiff asserts claims against Armor for Deliberate Indifference-Conditions of Confinement Entity and Deliberate Indifference-Conditions of Confinement *Respondeat Superior*. *Id*. at 16-17. Plaintiff also asserts Oklahoma state law claims of negligence, wrongful death and "survival" against Armor. *Id.* at 18-19.

Armor argues the Second Amended Complaint must be dismissed because:

a. Plaintiff has failed to alleged sufficient facts to support her "conditions of confinement" claims against Armor under 42 U.S.C. §1983; and

b. Plaintiff's entity claim against Armor must be dismissed because Plaintiff has failed to plead that Armor's "written or unwritten policies," customs or practices were the "moving force" behind the alleged constitutional deprivation.

Additionally, Armor contends Plaintiff's punitive damages claim under 42 U.S.C. § 1983 must be dismissed.

Armor also asserts that plaintiff's Oklahoma state law claims for negligence and statutory claims brought under the wrongful death and survival acts are inadequately pled, and that Armor has immunity from the state claims under the Oklahoma Governmental Tort Claims Act.

## IV. Analysis

### A. 42 U.S.C. ¶1983 Claims

In order to state a viable claim under §1983, a plaintiff must plead that the conduct complained of was committed by a person acting under color of state law, and that such conduct deprived the plaintiff of a right, privilege or immunity secured by the Constitution and laws of the United States. *West v. Atkins*, 487 U.S. 42, 48 (1988). Because Section 1983 liability attaches only to conduct occurring "under color of state law," the only proper defendants in a Section 1983 claim are those who "represent [the state] in some capacity, whether they act in accordance with their authority or misuse it." *Gallagher v. Neil Young Freedom Concert*, 49 F.3d 1442, 1447 (10nh Cir. 1995) (quoting *Nat'l Collegiate Athletic Ass'n v. Tarkanian*

Plaintiff makes two claims for unconstitutional "conditions of confinement" under Section 1983: one directly against Armor for its "written policies and unwritten policies," (Doc. 16, ¶¶81-82), and one, premised on *respondeat superior*, for the alleged unconstitutional conduct of its employees and/or agents. *Id.*, ¶¶83-84.

#### 1. Conditions of Confinement

"The Eighth Amendment, which applies to the States through the Due Process Clause of the Fourteenth Amendment, prohibits the infliction of 'cruel and unusual punishments' on those convicted of crimes." *Wilson v. Seiter*, 501 U.S. 294, 296-97. As a result, "[p]rison officials have

10

a duty under the Eighth Amendment to provide humane conditions of confinement," including "adequate food, clothing, shelter, and *medical care*." *Farmer v. Brennan*, 511 U.S. 825, 825 (1994) (emphasis added).

However, "in the medical context, an inadvertent failure to provide adequate medical care cannot be said to constitute 'an unnecessary and wanton infliction of pain' or to be repugnant to the conscience of mankind." *Estelle v. Gamble*, 429 U.S. 97, 105-106 (1976). Accordingly, "a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment," and "[m]edical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Id.* at 106. Rather, "[i]n order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence *deliberate indifference to serious medical needs*. It is only such indifference that can offend 'evolving standards of decency' in violation of the eight Amendment." *Id.* (emphasis added).

The Tenth Circuit has held that in order to plead a viable Eighth Amendment claim in a prisoner case, a plaintiff must allege:

> (1) "actual knowledge of the specific risk of harm [to the detainee] . . . or that the risk was so substantial or pervasive that knowledge can be inferred;" (2) "fail[ure] to take reasonable measures to avert the harm;" and that (3) "failure to take such measures in light of [the] knowledge, actual or inferred, justifies liability for the attendant consequences of [the] conduct, even though unintended."

*Estate of Hocker by Hocker v. Walsh*, 22 F.3d 995, 1000 (10th Cir 1994) (citing *Berry v. City of Muskogee*, 900 F.2d 1489, 1498 (10th Cir. 1990). *See also Bowen v. City of Manchester*, 66 F.2d 13, 17 (1st Cir. 1992) (holding that a plaintiff may establish deliberate indifference in a prison suicide case by showing that (1) the detainee exhibited strong signs of suicidal tendencies; (2) the jail officials had actual knowledge of, or were willfully blind to, the *specific* risk that the detainee

in question would commit suicide; and (3) the jail officials then failed to take steps to address that known, specific risk.)).[3]

Taking as true the allegations of the Second Amended Complaint, the Court concludes that Armor was aware that Bradshaw was a heroin user, he had recently injected drugs, he had received treatment for drug abuse, and he had received mental health treatment for bipolar disorder, manic depressive disorder and borderline personality disorder. The allegations also establish that earlier in the day on March 13, 2016, Bradshaw gave a detention officer a note stating that his anxiety was "unbearable" and requesting to speak to someone in Mental Health. However, Plaintiff does not allege Armor received that note, that Armor personnel were made aware of the note, or that Bradshaw reported anxiety or suicidal thoughts to Armor during a subsequent 6:42 p.m. CIWA or at any other time. Accordingly, the Court concludes that the allegations fail to establish that Armor had "actual knowledge "of the specific risk that Bradshaw was suicidal. . . or that the risk was so substantial or pervasive that knowledge can be inferred." *Estate of Hocker*, supra.

### 2. Respondeat Superior Claim

It is well established that §1983 does not impose vicarious liability based solely on the existence of an employer-employee relationship. *Monell v. New York City Dept. of Social Servs.*, 436 U.S. 658, 691-92 (1978). Moreover, as noted above, the Second Amended Complaint does

---

[3] Citing *Kingsley v. Hendrickson*, 135 S. Ct. 2466 (2015) and *Castro v. Los Angeles Cty.*, 833 F.3d 1060 (9th Cir., 2016) Plaintiff argues that the appropriate standard for evaluating her claims is one of "objective reasonableness." In *Kingsley*, the Supreme Court ruled that the proper standard for evaluating *excessive force* claims by pretrial detainees is an objective reasonableness test similar to the standard used to evaluate on-the-street claims of excessive force by arrestees. 135 S.C. at 2472-73. Subsequently, the Ninth Circuit—citing *Kingsley*—followed the *Kingsley* rationale and applied the objective reasonableness standard to a failure-to-protect claim brought by a pretrial detainee. *Castro v. Los Angeles Cty.*, 833 F.3d 1060, 1069 (9th Cir. 2016). Plaintiff has cited no authority for her argument that the objective reasonableness standard applies in the context of claim arising from alleged failure to provide adequate medical care to a pretrial detainee, and as noted above the appropriate standard in this circuit is "deliberate indifference." *Hocker*, supra.

not allege that any Armor employee was ever given the note, or that Armor employees or agents had actual knowledge of the risk that Bradshaw was suicidal. Instead, Plaintiff's deliberate indifference claim appears to be based on a theory that suicide in jails is so substantial or pervasive that knowledge of the risk to an inmate such as Bradshaw could be suicidal can be inferred. Accordingly, all of Plaintiff's constitutional claims against Armor premised on vicarious liability are subject to dismissal.

### B. State Law Claims

The Second Amended Complaint alleges state law claims against Armor for wrongful death and negligence. In its Motion to Dismiss, Armor asserts that the Oklahoma GTCA renders it immune to these claims. A recent decision by the Oklahoma Supreme Court is dispositive of this issue.

In *Barrios v. Haskall County Public Facilities Auth.*, 2018 OK 90 (Okla. Dec. 4, 2018), the Oklahoma Supreme Court specifically addressed the issue of whether jail healthcare contractors such as Armor and its employees are immune from tort liability under the state's GTCA. It found that "the staff of a healthcare contractor at a jail are 'employees' who are entitled to tort immunity under the GTCA by virtue of section 152(7)(b), 153(A), and 155(25)." *Id.*, n. 5 (emphasis added). Additionally, the Court reasoned—based on this finding—that independent contractors who provide health care services to county jails (like Armor), and their staff, should also be considered to be "employees" under the GTCA and be entitled to the same immunity from tort claims. *Id.* *See also Prince v. Turn Key Health Clinics, LLC*, Case No. 18-CV-282 (N.D. Okla. Jan. 16, 2019), (citing *Barrios* in granting defendant's motion to dismiss a state law negligence claim against a prison health care contractor).

Pursuant to the Oklahoma Supreme Court's ruling in *Barrios*, the Court concludes that the GTCA immunity provisions apply to Armor and its employees, who are therefore exempt from tort liability by virtue of §§ s1572(7)(b), 153(A) and 155(25) (claims arising out of "[p]rovision, equipping, operation or maintenance of any prison, jail or correctional facility").

Accordingly, Armor's motion to dismiss Plaintiffs' state law claims against Armor must be granted.

## V. Conclusion

For the reasons set forth above, Armor's Motion to Dismiss the Second Amended Complaint (Doc. 18) is hereby granted.

ENTERED this 17th day of April, 2019.

_____
TERENCE C. KERN
United States District Judge